## U.S. DISTRICT COURT FOR THE
## CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| Hada Garcia; | ) | |
| Lidianelly Carreon Garcia; | ) | |
| David Carreon Vazquez; | ) | |
| Mario H. Gonzalez; | ) | |
| Ramon Hernandez Jr.; | ) | |
| Alberto Montalvo Sr.; | ) | |
| Alberto Montalvo Jr.; | ) | |
| Consuelo Diana Perez, | ) | Case No. |
|     individually and as next friend of | ) | |
| A.P.; | ) | JURY DEMANDED |
| Adrian Perez; | ) | |
| Liliana Rodriguez, | ) | |
|     individually and as next friend of | ) | |
| E.R.; | ) | |
| Patricia Rodriguez; | ) | |
| Diane Acuna, as next friend of | ) | |
| V.A.; | ) | |
| Vanessa Guzman; | ) | |
| Gilbert Sanchez Jr.; | ) | |
| Luis Alonzo Sifuentes; | ) | |
| Miguel Sifuentes; | ) | |
| Ediel Tanguma Trevino; | ) | |
| Judith Valdez, | ) | |
| individually and as next friend of | ) | |
| S.V., | ) | |
| Jesus Javier Zuniga Silva & | ) | |
| Yadira Zuniga, | ) | |
|     individually and as next friends of | ) | |
| Ja.Z. and | ) | |
| J.J.Z.; | ) | |
| Jose E. Zuniga; | ) | |
| Jennifer Zuniga, | ) | |
|     individually and as next friend of | ) | |
| Ad.H., Al.H.,& An.H.; | ) | |
| Maria Abigail Zuniga, | ) | |
|     individually and as next friend of | ) | |
| L.C. & Y.C.; | ) | |
| | ) | |
|     Plaintiffs. | ) | |
| | ) | |

v.                                           )
                                             )
Pioneer Hi-Bred International, Inc.;         )
Corteva, Inc.;                               )
Unknown Pesticide Applicator #1;             )
Farm Air, Inc.; and                          )
Curless Flying Service, Inc.;                )
                                             )
     Defendants.     )

## COMPLAINT

### INTRODUCTORY STATEMENT

1.    In the summer of 2019, Defendants Pioneer Hi-Bred International, Inc. and Corteva, Inc. (collectively, "PHI") brought dozens of migrant workers from the Texas Rio Grande Valley to work detasseling corn in Illinois fields. In two separate incidents that summer, Defendants Unknown Pesticide Applicator #1, Farm Air Inc., and Curless Flying Service, Inc. (collectively, "Pesticide Applicators") sprayed the Plaintiff workers (the "Workers") with toxic pesticides as they worked, even though the Workers were plainly visible. After each incident, Defendant PHI (1) failed to provide adequate decontamination measures to the Workers to mitigate the toxicity, and (2) failed to provide truthful information and necessary medical attention to the injured Workers. Moreover, after the second incident, Defendant PHI (1) immediately ordered Workers to return to work in the field, despite the still-ambient pesticides, where Defendants Farm Air, Inc. and Curless Flying Service, Inc. (collectively, the "Curless Defendants") then sprayed the Workers a second time; and then (2) lied to the Workers about what had occurred, claiming the spray had been smoke, and refusing to provide known information about the

2

pesticides involved.

2.      Moreover, Defendant PHI violated numerous other worker protections secured under the Migrant and Seasonal Agricultural Worker Protection Act ("AWPA"), 29 U.S.C. §§ 1801-1872, the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201-219, and similar state laws.

3.      On August 5, 2019, the Curless Defendants intentionally, with callous and reckless indifference, and otherwise tortiously, sprayed the Workers, who were plainly visible in bright neon protective clothing.

4.      Plaintiffs are the Workers and their non-worker family members (the "Children") who were harmed by pesticide exposure and other violations of law. They seek redress from Defendants jointly and severally, in the form of their actual damages, including medical expenses and compensation for emotional distress; punitive damages commensurate with the egregious nature of the Defendants' conduct; all liquidated damages available to them under the AWPA and the FLSA; and attorneys' fees and reasonable costs.

## JURISDICTION

5.      This Court has jurisdiction over the Workers' and the Children's claims arising under the AWPA and the FLSA under 28 U.S.C. § 1331 (conferring jurisdiction over civil actions arising under laws of the United States).

6.      This Court also has jurisdiction over the Workers' and the Children's claims under 28 U.S.C. § 1332(a), based on the following facts establishing complete diversity of citizenship and satisfaction of the amount-in-controversy requirement:

a.   The Workers and Children are all citizens of Texas;

b.   Defendant Pioneer Hi-Bred International, Inc. is incorporated in Iowa, where it maintains its principal place of business;

c.   Defendant Corteva, Inc. is incorporated in Delaware, where it maintains its principal place of business;

d.   Defendant Farm Air, Inc. is incorporated in Illinois, where it maintains its principal place of business;

e.   Defendant Curless Flying Service, Inc. is incorporated in Illinois, where it maintains its principal place of business;

f.   The amount in controversy for each Worker and Child exceeds $75,000.

7.   This Court has supplemental jurisdiction over the Workers' and Children's state law claims under 28 U.S.C. § 1367, in that the claims are so related to the claims in the action with such original jurisdiction that they form part of the same case or controversy under Article III of the U.S. Constitution.

8.   This Court is the appropriate venue under 28 U.S.C. § 1391(b), in that the Defendants are subject to personal jurisdiction in this District, and a substantial part of the events or omissions giving rise to the claims in this Complaint occurred in this District.

9.   This action is brought in the Springfield Division, because the events giving rise to the claims occurred in DeWitt County. *See* CDIL-LR 40.1(B), (F).

## PARTIES

### Plaintiffs

10.     In the spring and early summer of 2019, husband and wife farm labor contractors Fidencio Salinas ("FLC Fidencio") and Arminda Salinas ("FLC Arminda") (collectively, the "Salinases"), working on behalf of Defendant PHI in Texas, recruited the Workers identified below to perform roguing (weeding out inferior plants) and detasseling (removing corn tassels to prevent self-pollination) in Illinois that summer; arranged for their hire, accommodations, and other logistical details; and subsequently assisted PHI with supervising them in the fields.

11.     Plaintiff Hada Garcia is 41 years old and lives with her children, Plaintiff Lidianelly Carreon Garcia and Plaintiff David Carreon Vazquez, in Rio Grande City, Texas.

12.     Plaintiff Lidianelly Carreon Garcia is 21 years old and lives with her mother, Hada, and her brother, David, in Rio Grande City, Texas.

13.     Plaintiff David Carreon Vazquez is 18 years old and lives with his mother, Hada, and his sister, Lidianelly, in Rio Grande City, Texas.

14.     Plaintiff Mario H. Gonzalez is 59 years old and lives in Mission, Texas.

15.     Plaintiff Ramon Hernandez Jr., is 56 years old and lives in Garciasville, Texas.

16.     Plaintiff Alberto Montalvo Sr. is 39 years old and lives with his son, Plaintiff Alberto Montalvo Jr., in Rio Grande City, Texas.

17.     Plaintiff Alberto Montalvo Jr. is 18 years old and lives in Rio Grande City, Texas, with his father, Alberto Sr.

18.    Plaintiff Consuelo Diana Perez is 38 years old and lives in Alton, Texas, with her family, including her son, Plaintiff Adrian Perez; and her daughter, Plaintiff A.P.

19.    Plaintiff Adrian Perez is 18 years old and lives in Alton, Texas, with his mother, Consuelo; his sister, A.P.; and other family members.

20.    Plaintiff A.P. is 16 years old and lives in Alton, Texas with her mother and next friend, Consuelo; her brother, Adrian; and other family members.

21.    Plaintiff Liliana Rodriguez is 41 years old and lives in Mission, Texas, with her daughters, Plaintiff E.R. and Plaintiff Patricia Rodriguez.

22.    Plaintiff E.R. is 17 years old and lives with her mother and next friend, Liliana, and her sister, Patricia, in Mission, Texas.

23.    Plaintiff Patricia Rodriguez is 18 years old and lives with her mother and next friend, Liliana, and her sister, E.R., in Mission, Texas.

24.    Plaintiff V.A., Liliana's nephew, is 16 years old and lives with his family in Edinburg, Texas. He brings this suit through his older sister Diane Acuna as his next friend.

25.    Plaintiff Vanessa Guzman, Liliana's niece, is 18 years old and lives with her family in Mission, Texas.

26.    Plaintiff Gilbert Sanchez Jr. is 57 years old and lives in Weslaco, Texas.

27.    Plaintiff Luis Alonzo Sifuentes is 60 years old and lives in Donna, Texas.

28.    Plaintiff Miguel Sifuentes is 63 years old and lives in Donna, Texas.

29.    Plaintiff Ediel Tanguma Trevino is 41 years old and lives in Rio Grande City, Texas.

30.    Plaintiff Judith Valdez is 50 years old and lives in Rio Grande City, Texas, with her daughter, Plaintiff S.V.

31.    Plaintiff S.V. is 17 years old and lives in Rio Grande City, Texas, with her mother and next friend, Judith.

32.    Plaintiff Jesus Javier Zuniga Silva is 43 years old and lives in Mercedes, Texas, with his wife, Plaintiff Yadira Zuniga; their nine-month-old daughter, Plaintiff Ja.Z.; their 17-year-old son, Plaintiff J.J.Z.; and other family members.

33.    Plaintiff Yadira Zuniga is 38 years old and lives in Mercedes, Texas, with her husband, Jesus Javier; their daughter, Ja.Z.; their son, J.J.Z.; and other family members.

34.    Plaintiff Ja.Z. is nine months old and lives in Mercedes, Texas, with her parents and next friends Jesus Javier and Yadira; her brother J.J.Z.; and other family members.

35.    Plaintiff J.J.Z. is 17 years old and lives in Mercedes, Texas with his parents and next friends Jesus Javier and Yadira; his sister, Ja.Z.; and other family members.

36.    Plaintiff Jose E. Zuniga is 18 years old and lives in Donna, Texas. Jose E. is Jesus Javier and Yadira's nephew.

37.     Plaintiff Jennifer Zuniga is 20 years old and lives in Weslaco, Texas with her partner (not a party) and their children, including Plaintiff Ad.H., Plaintiff Al.H., and Plaintiff An.H. (collectively, the "Hernandez Children"). Jennifer is Jesus Javier and Yadira's daughter.

38.     Plaintiff Ad.H. is two years old and lives in Weslaco, Texas, with his mother and next friend, Jennifer; his father; and his siblings, including Al.H. and An.H.

39.     Plaintiff Al.H. is about a year and a half old and lives in Weslaco, Texas, with her mother and next friend, Jennifer; her father; and her siblings, including Ad.H. and An.H.

40.     Plaintiff An.H. is three years old and lives in Weslaco, Texas, with her mother and next friend, Jennifer; her father; and her siblings, including Ad.H. and Al.H.

41.     Plaintiff Maria Abigail Zuniga is 22 years old and lives in Mercedes, Texas with her partner (not a party); two children, Plaintiff L.C. and Plaintiff Y.C. (the "Casarez Children"); and other non-party family members.

42.     Plaintiff L.C. is 19 months old and lives in Mercedes, Texas with his family, including his mother and next friend, Maria Abigail; his father (not a party); and his sister, Y.C.

43.     Plaintiff Y.C. is 5 years old and lives in Mercedes, Texas with her family, including her mother and next friend, Maria Abigail; her father (not a party); and her brother, L.C.

8

## Defendants

44.     Defendant Pioneer Hi-Bred International, Inc. is an Iowa corporation
that uses migrant agricultural workers in its farm operations in Illinois, and which
constituted the Workers' "agricultural employer" within the meaning of the AWPA,
29 U.S.C. § 1802(2).

45.     Defendant Corteva, Inc., d/b/a Corteva Agriscience ("Corteva"), is
Defendant Pioneer Hi-Bred International's parent company. Defendant Corteva is a
publicly traded agricultural chemical and seed company with its principal place of
business in Wilmington, Delaware. Defendant Corteva was the Workers'
"agricultural employer" within the meaning of the AWPA, 29 U.S.C. § 1802(2).

46.     Defendant Unknown Pesticide Applicator #1 owns and operates the
helicopter involved in the July Event described in this Complaint, and employed or
contracted with the pilot of that helicopter.

47.     Defendant Farm Air, Inc. ("Farm Air") is an Illinois Corporation with
its principal place of business in Astoria, Illinois, which provides and maintains
aircraft used to apply pesticides to Illinois farms. Farm Air's president is Harley Joe
Curless of Astoria, Illinois. Farm Air owned the plane involved in the August Event
described in this Complaint.

48.     Defendant Curless Flying Service, Inc. ("Curless") is an Illinois
Corporation with its principal place of business in Astoria, Illinois, which employs
licensed pesticide applicators to apply pesticides to Illinois farms. Defendant
Curless's president is Harley Joe Curless of Astoria, Illinois. Defendant Curless

operated the plane involved in the August Event described in this Complaint.

## APPLICABLE LAW

### AWPA

49.     Congress passed the AWPA to address "activities detrimental to migrant and seasonal agricultural workers; to require farm labor contractors to register . . . ; and to assure necessary protections for migrant and seasonal agricultural workers, agricultural associations, and agricultural employers." 29 U.S.C. § 1801.

50.     Under the AWPA, every agricultural employer that recruits any migrant agricultural worker is required to "ascertain and disclose *in writing* to each such worker who is recruited for employment the following information *at the time of the worker's recruitment*: (1) the place of employment; (2) the wage rates to be paid; (3) the crops and kinds of activities on which the worker may be employed; (4) the period of employment; (5) the transportation, housing, and any other employee benefit to be provided, if any, and any costs to be charged for each of them; (6) the existence of any strike or other concerted work stoppage, slowdown, or interruption of operations by employees at the place of employment; (7) the existence of any arrangements with any owner . . . of any establishment . . . to receive a commission or any other benefit resulting from any sales by such establishment to the workers; and (8) whether State workers' compensation insurance is provided, and, if so, the name of the State workers' compensation insurance carrier, the name of the policyholder of such insurance, the name and the telephone number of each person

who must be notified of an injury or death, and the time period within which such notice must be given." 29 U.S.C. § 1821(a) (emphasis added); *see also* 29 C.F.R. § 500.76(b).

51.     In addition, every agricultural employer that employs any migrant agricultural worker "shall—(1) with respect to each such worker, make, keep, and preserve records for three years of the following information: (A) the basis on which wages are paid; (B) the number of piecework units earned, if paid on a piecework basis; (C) the number of hours worked; (D) the total pay period earnings; (E) the specific sums withheld and the purpose of each sum withheld; and (F) the net pay; and (2) provide to each such worker for each pay period, an itemized written statement of the information required by paragraph (1) of this subsection." *Id.* § 1821(d).

52.     In addition, no agricultural employer that employs any migrant agricultural worker shall "knowingly provide false or misleading information to any migrant agricultural worker concerning the terms, conditions, or existence of agricultural employment required to be disclosed by subsection (a), (b), (c), or (d)." *Id.* § 1821(f).

53.     The disclosures required by § 1821(a) through (c) "shall be provided in written form. Such information shall be provided in English or, as necessary and reasonable, in Spanish or other language common to migrant agricultural workers who are not fluent or literate in English." *Id.* § 1821(g).

54.     Every agricultural employer that employs any migrant agricultural

11

worker shall pay the wages owed to such worker when due. *Id.* § 1822(a).

55.     In addition, no agricultural employer "shall, without justification, violate the terms of any working arrangement made by that contractor, employer, or association with any migrant agricultural worker." *Id.* § 1822(c).

### FIFRA Statute and Worker Protection Standards ("WPS")

56.     The Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), administered and enforced by the U.S. Environmental Protection Agency ("USEPA"), governs the use of pesticides in the United States. 7 U.S.C. §§ 136-136y.

57.     Under the FIFRA, "pesticide" is defined to include (with some exceptions inapplicable here) "(1) any substance or mixture of substances intended for preventing, destroying, repelling, or mitigating any pest, (2) any substance or mixture of substances intended for use as a plant regulator, defoliant, or desiccant, and (3) any nitrogen stabilizer." 7 U.S.C. § 136(u).

58.     Under the FIFRA, the USEPA created protections for agricultural workers through pesticide-specific restrictions and label requirements, called the Worker Protection Standards ("WPS"). 40 C.F.R. Part 170.

59.     The FIFRA makes it unlawful for anyone to use a pesticide in a manner inconsistent with its labeling. *Id.* § 136j(a)(2)(G).

60.     The WPS "contains a standard designed to reduce the risks of illness or injury resulting from workers' and handlers' occupational exposures to pesticides used in the production of agricultural plants on farms . . . and also from the accidental exposure of workers and other persons to such pesticides. It requires

workplace practices designed to reduce or eliminate exposure to pesticides and establishes procedures for responding to exposure-related emergencies." 40 C.F.R. § 170.1.

61.  The WPS defines "agricultural employer" to include an owner or responsible manager of an "agricultural establishment," which is includes, *inter alia*, a farm. 40 C.F.R. §§ 170.3; 170.305.

62.  "Employ" means "to obtain, directly or through a labor contractor, the services of a person in exchange for a salary or wages . . . without regard to who may pay or who may receive the salary or wages." *Id.* § 170.3.

63.  A "handler" is defined to include a person employed by an agricultural employer to apply pesticides. *Id.*

64.  "Handler employer" means anyone "self-employed as a handler or who employs any handler." *Id.*

65.  "Use, as in 'to use a pesticide'" includes application as well as "[p]ost-application activities intended to reduce the risks of illness and injury resulting from handlers' and workers' occupational exposures to pesticide residues during and after the restricted-entry interval, including responsibilities related to worker notification, training of workers or early-entry workers, providing decontamination supplies, providing pesticide safety information and pesticide application and hazard information, use and care of personal protective equipment, providing emergency assistance, and heat stress management." *Id.* § 170.305.

66.  "Early entry means entry by a worker into a treated area on the

13

agricultural establishment after a pesticide application is complete, but before any restricted-entry interval for the pesticide has expired." *Id.*

67. Under the WPS, the "agricultural employer" must assure that workers receive required protections. *Id.* §§ 170.7(a)(1); 170.309(b).

68. The agricultural employer must assure that any covered pesticide is used in a manner consistent with the labeling of the pesticide; provide, to each person who supervises any worker or handler, information and directions sufficient to assure that each worker or handler receives the required protections; and "[r]equire each person who supervises any worker or handler to assure compliance by the worker or handler with the provisions of this part and to assure that the worker or handler receives the protections required by this part." *Id.* § 170.7(a)(2)-(4); *see also id.* § 170.309(a).

69. In addition, "[d]uring the application of any pesticide on a farm . . . , the agricultural employer shall not allow or direct any person, other than an appropriately trained and equipped handler, to enter or to remain in the treated area." *Id.* § 170.110; *see also id.* § 170.407(a).

70. In addition, "after the application of any pesticide on an agricultural establishment, the agricultural employer shall not allow or direct any worker to enter or to remain in the treated area before the restricted-entry interval specified on the pesticide labeling has expired, except as provided in this section." *Id.* § 170.112(a); *see also id.* § 170.407(a).

71. The WPS requires the employer to notify workers of pesticide

14

applications on farms, which, depending on the labeling of the covered pesticide, may require *both* posting of treated areas *and* oral notification, or *either* posting *or* oral notice. *Id.* § 170.120(b); *see also id.* § 170.409(a)(1).

72.     Where posting is required, the agricultural employer must post signs stating DANGER and PESTICIDES in English and Spanish, with specific size and lettering requirements, at least 24 hours before and throughout the duration of the application and restricted-entry interval, and it must remove the signs within three days after the end of the restricted-entry interval. *See id.* § 170.120(c); *see also id.* § 170.409(b).

73.     Where oral warnings are permitted, the warning must state the location of the treated area, the time of restricted entry, and instructions not to enter until the restricted-entry interval is over. *Id.* § 170.120(c); *see also id.* § 170.409(c).

74.     In addition, when workers are on a farm that has had a covered pesticide applied within the last 30 days, the agricultural employer is required to display certain information about the pesticide, including the product name and active ingredient, the time and date of application, and the restricted-entry interval. *Id.* § 170.122.

75.     When workers are on a field that has had a covered pesticide applied within the last 30 days, the agricultural employer also must display safety information, including instructions stating what to do if exposed and the location of the nearest medical facilities. *Id.* §§ 170.135; 170.309(h); 170.311.

76.    The WPS also contains detailed provisions requiring decontamination, including requiring provision of supplies in an accessible location whenever a pesticide was applied within the past 30 days; enough water for washing and emergency eye flushing, and sufficient soap and single-use towels. 40 C.F.R. §§ 170.150; 170.411.

77.    Whenever there is reason to believe a worker

has been poisoned or injured by exposure to pesticides used on the agricultural establishment, including, but not limited to, exposures from application, splash, spill, drift, or pesticide residues, the agricultural employer shall:

(a) Make available to that person prompt transportation from the agricultural establishment . . . to an appropriate emergency medical facility.

(b) Provide to that person or to treating medical personnel, promptly upon request, any obtainable information on:

(1) Product name, EPA registration number, and active ingredients of any product to which that person might have been exposed[;]

(2) Antidote, first aid, and other medical information from the product labeling[;]

(3) The circumstances of application or use of the pesticide on the agricultural establishment[;]

(4) The circumstances of exposure of that person to the pesticide.

*Id.* § 170.160.

78.    If an agricultural employer directs a worker to perform activities in a treated area before expiration of the re-entry period, "[t]he agricultural employer must ensure that the worker is at least 18 years old." *Id.* § 170.605(a).

16

79. In addition, before such entry, the agricultural employer must provide each worker certain information, including the pesticides applied, the time of the restricted-entry intervals, the basis for the early entry, what contact is permitted, the amount of time the worker is allowed in the restricted area, the personal protective equipment required by the labeling, and the location of safety information. *Id.* § 605(b).

80. Before such entry, the employer must also ensure the worker has read the applicable labeling and has the proper protective equipment, on which the worker must be properly instructed, which the employer must properly maintain, and which the employer may not allow any worker to take home. *Id.* § 605(d)-(g).

81. Finally, in the case of such entry, the employer must provide additional decontamination supplies, including portable eye-flushing containers and sufficient water for the workers to wash thoroughly. *Id.* § 605(h)-(j).

**OSHA Statute and the field sanitation standards ("FSS")**

82. The Occupational Safety and Health Act ("OSHA") requires the U.S. Department of Labor ("USDOL") to promulgate occupational safety and health standards where they would result in improved safety or health for designated employees. 29 U.S.C. § 655(a).

83. Pursuant to the OSHA, the USDOL created field sanitation standards ("FSS") applicable to any agricultural establishment where 11 or more employees work in hand-labor field operations. *See* 29 C.F.R. § 1928.110(a).

84.    The FSS requires agricultural employers to provide "drinking water . . . in sufficient amounts, taking into account the air temperature, humidity and the nature of the work performed, to meet the needs of all employees." *Id.* § 1928.110(c)(1).

85.    The FSS requires employers to provide "toilet and handwashing facilities" and to maintain them "in clean and sanitary condition." *Id.* § 1928.110(c)(2),(3).

86.    The FSS requires that handwashing facilities "be refilled with potable water as necessary to ensure an adequate supply." *Id.*

87.    The FSS requires the employer to inform each employee of the importance of drinking water frequently. *Id.* § 1928.110(c)(3),(4).

## STATEMENT OF FACTS

### Generally Applicable Facts[1]

88.    In the spring of 2019, Defendant PHI, through its agents, FLC Fidencio and FLC Arminda, recruited each of the Workers from Texas, where they lived, to work temporarily in central Illinois that summer.

89.    Most of the Workers[2] would perform the task of detasseling corn.[3]

90.    Most of the Workers signed work-related documents in Texas as part of

---

[1] The following facts apply to each of the Workers, with exceptions as noted.

[2] Plaintiff Alberto Montalvo Sr. did not perform detasseling work; Alberto Sr. was recruited to drive the other workers to and from their motel and the fields in which they worked.

[3] Detasseling corn involves removing the tassels that hold the corn's staminate flowers, to prevent it from self-pollinating.

the recruitment process. (For the Workers who were minors, an adult signed on their behalf.)

91.    These documents included a "Worker Disclosure and Information Statement," which provided, *inter alia*, the following terms:

    a.    A rate of pay of $9.25[4] per hour;

    b.    A housing stipend of $22 per day, for each day worked;

    c.    Paid one-way travel to the fields;

    d.    Paid breaks of 29 minutes or less, and breaks of 30 minutes or more unpaid.

92.    The Worker Disclosure and Information Statement did not contain any information about workers' compensation insurance.

93.    Each of the Workers arrived from Texas around the first week of July.

94.    The Salinases arranged for the Workers to stay at either the Candlewood Suites ("Candlewood") or the WoodSpring Suites ("WoodSpring"), both located in Champaign, Illinois.

95.    During the first week, the Workers only worked five days, but after the first week, they generally worked six or seven days per week, with only an occasional day off.

96.    To get to the fields each day, the Workers rode on buses that Defendant PHI provided, except for Jesus Javier and his family, who rode in Jesus

---

[4] Defendant PHI promised a few of the Workers a different hourly wage, as follows: Alberto Sr. ($15 per hour); Jesus Javier Sr. ($13 per hour); Mario ($10 per hour); Ramon ($10 per hour).

Javier's truck.

97.     The average workday at the field started around 5:00 a.m., which meant the Workers had to be ready to take their bus around 4:00 a.m. Most of the Workers therefore got up between 3:00 and 3:30 a.m.

98.     Normally it took about 30 to 40 minutes for the Workers to get to the field.

99.     When the Workers arrived, they had about 15 minutes to change into their work clothes and put on their visibility safety gear, and then enter the field. Sometimes they had to wait for sufficient daylight to begin working.

100.    The Workers' main task, detasseling, required the Workers to walk through each row of corn to remove the spiky tassel from the tops of the plants.

101.    The Workers all wore bright neon orange hats and backpacks as they worked so that they would be visible and therefore safer.

102.    The Workers received one 10- or 15-minute break each morning, then a 30-minute break for lunch, and then, occasionally, another 10- or 15-minute break in the afternoon.

103.    When the Workers took bathroom breaks, FLC Fidencio would tell them to hurry up and return to the field.

104.    For all 100 or so workers, the fields had two to four portable toilets on each side of the field, sometimes designated by gender (although the designations were allowed to be ignored).

105.    The toilets were often extremely dirty and sometimes lacked toilet

paper.

106.    At times Defendant PHI would keep a supervisor outside the portable toilets to hand out toilet paper—he would address each Worker waiting in line, ask how much they needed, and then give it to the Worker.

107.    There were also small sinks on each side of the field for handwashing, which sometimes ran out of soap; occasionally there was no water for handwashing.

108.    Defendant PHI provided tap water (brought from the motel) for drinking, but it did not taste good.

109.    PHI managers constantly reminded the Workers not to drink too much water.

110.    Water ran out on more than one occasion.

111.    The Workers always ate their lunch on the buses.

112.    About once a week, they would eat on the bus while it was taking them to another field.

113.    Whether or not the bus was moving and transporting them to another field, the Workers were not paid for their lunch time.

114.    Sometimes, when the Workers ate their lunches, and the trip between fields was shorter than 30 minutes, the Workers did not receive their full 30-minute lunch break, but it was still unpaid.

115.    Defendant PHI had represented in its Worker Disclosure and Information Statement that breaks under 30 minutes would be paid.

116.    Most days, the workday ended in the field between about 4:00 and 5:00

p.m. and the Workers would arrive back at their motel between 5:00 and 6:00 p.m.

*The July Event*

117.   In the afternoon of July 23, 2019, at around 4:00 p.m., most of the Workers had just entered the last field on which they were scheduled to work that day, when a helicopter flew overhead from an adjacent field, spraying a liquid that quickly dispersed across the field (the "July Event").

118.   Defendant Unknown Pesticide Applicator #1 owned and operated the helicopter.

119.   The experience of each of the individual Workers in the July Event is set forth in more detail below.

120.   Defendant Unknown Pesticide Applicator #1, through its agent, the pilot, could plainly see the Workers, as it was a clear day, the corn was still shorter than most of the Workers, and the Workers were wearing their neon orange hats and backpacks.

121.   Many of the Workers began to smell a strong, bad odor.

122.   One of the Workers, Alberto Montalvo Sr., was on the bus at the time, preparing to drive the Workers back to their motel after the shift.

123.   From where Alberto Sr. sat, he could see that a helicopter was spraying a field right next to the Workers.

124.   He started honking the horn of the bus, a common way of summoning workers off the field.

125.   Workers and others in the field started shouting that everyone should

get out.

126.    The Workers left the field as quickly as they could.

127.    Many of the Workers rushing to get off the field emerged on the side opposite to where the buses were, and therefore needed to wait to be picked up.

128.    Many of the Workers immediately began to feel symptoms of chemical exposure, such as eye, skin, and throat irritation; difficulty breathing; numbness of the lips, mouth, or face; and headache.

129.    Once off the field, some of the Workers saw Defendant Unknown Pesticide Applicator #1's helicopter flying towards them and feared it would spray again, but it turned and flew over a neighboring field.

130.    After this incident, Defendant PHI and FLC Fidencio decided to end the work day and have everyone return to their motel.

131.    Defendant PHI provided no emergency medical assistance, decontamination measures, or instructions to the Workers about rinsing or washing themselves, and offered no transportation to a medical facility.

132.    Instead, Defendant PHI, through its managers, instructed Workers to board the buses immediately.

133.    The Workers did as instructed and immediately boarded the buses, and therefore most of them did not wash or rinse in any way after leaving the field, or receive any medical attention.

134.    Defendant PHI failed to provide adequate facilities at the field for the Workers to decontaminate properly, such as showers or other sources of ample

flowing water.

135.    Defendant PHI did not provide any of the Workers with any information regarding what pesticide had been sprayed, did not ask them if they were experiencing symptoms resulting from exposure, and did not provide instructions on decontamination.

136.    In fact, after ordering the Workers to board the buses, Defendant PHI managers did not discuss or even mention the incident again.

137.    The buses left the field to return the Workers to the motels where they were staying, which took about 45 minutes.

138.    The Workers were able to bathe only after they returned to the motel.

139.    Even after returning to the motel, many of the Workers had to wait for the others sharing their motel rooms to shower before they could do so.

140.    In the coming days and weeks, many Workers and some of the Children experienced worsening and new symptoms, including diarrhea, skin rash, headaches, loss of appetite, vomiting, and eye irritation.[5]

141.    Most of the Workers returned to work the next day, despite their symptoms.

142.    Some could not return to work due to their symptoms.

143.    After the July Event, no agent of Defendant PHI ever mentioned it to the Workers again.

---

[5] The Workers describe their individual experiences below, under "Facts Relating To Specific Workers."

144.    Some of the Workers reported their physical symptoms to PHI managers, but no PHI employee provided information, advice or assistance in receiving medical attention.

145.    Some of the Workers sought medical attention for themselves or the Children on their own at area healthcare facilities in the coming days and weeks.

*The August Event*

146.    On August 5, 2019, in the mid-afternoon, the Workers were again working in a field, detasseling corn.

147.    The Workers saw a plane suddenly fly in the direction of the field in which they were working, and then fly overhead, passing over the field they were working in several times, spraying as it went.

148.    The Curless Defendants owned and operated this plane.

149.    The experience of each of the individual Workers in what followed (collectively, the "August Event") is set forth below.

150.    The Curless Defendants' plane flew so low that some of the Workers could read the numbers on it and could see the pilot.

151.    The Curless Defendants' agent, piloting the plane, could plainly see the Workers, as it was a clear day, the corn was still shorter than most of the Workers, and the Workers wore bright neon orange hats and backpacks.

152.    Many of the Workers saw a liquid spray come out of the plane, felt a mist, and smelled a strong, bad odor.

153.    Many of the Workers immediately felt symptoms such as eye, skin, and

25

throat irritation; numbness of their lips, mouth, or face; or difficulty breathing.

154.  As the Workers realized what was happening, they ran out of the field as quickly as they could.

155.  Many Workers also yelled to each other or called each other on their phones to alert everyone to get off the field.

156.  The Workers felt fear and panic.

157.  PHI Managers and FLC Fidencio were outside the field where some of the Workers got out, and additional PHI managers arrived shortly thereafter.

158.  Many Workers received no instruction whatsoever regarding what to do about the exposure.

159.  Several of the Workers were not able to rinse off at all, due to Defendant PHI's failure to provide adequate decontamination facilities or instruction.

160.   Some of the PHI managers and FLC Fidencio asked some individual Workers whether they were OK.

161.  The PHI managers told some Workers who reported symptoms to wash off.

162.  Some of these Workers were able to use a hose with light pressure to rinse off.

163.  These Workers waited their turn to use the hose to rinse off the upper portion of their bodies.

164.  Initially, there was no soap.

165.   FLC Arminda left to obtain some, later returning with dish soap.

166.   Some Workers used small amounts of water intended for drinking or handwashing to try to rinse off.

167.   Some used the scant water to rinse only where they had actually felt the mist hit them, like their faces and necks.

168.   Some of the Workers removed outer layers of clothing to rinse off, but many did not remove any clothing.

169.   There was no area to undress privately and rinse, so the Workers, particularly the women, could not remove most of their clothes.

170.   PHI managers provided no additional instructions to the Workers about the exposure.

171.   During this time, some of the Workers saw and heard the FLCs speaking in person or by two-way radio or phone with PHI managers regarding whether Workers could return to work in the field.

172.   About 15 minutes after the plane first flew overhead, PHI managers ordered the Workers to go back into the same field to continue working.

173.   PHI managers conveyed that order directly to the Workers and to the FLCs.

174.   The FLCs, acting at the direction of these PHI managers, assured the Workers it was safe to return despite the lingering strong smell of pesticides.

175.   Relying on this direction and assurance, many of the Workers returned to work in the field, although some who were still waiting to rinse off, or who felt too

27

ill to return, remained off the field.

176.   Within about 10 minutes, the Curless Defendants' plane passed overhead again and sprayed the field and the Workers on it a second time.

177.   The plane flew overhead at least twice, spraying the area in which the Workers were working.

178.   Workers in the field began yelling, and those outside the field began honking their horns, to alert everyone to flee once again.

179.   Some of the Workers exited on the side of the field without buses, because that was closer to where they had been working.

180.   PHI managers told FLC Fidencio that Workers who had fled to that side of the field should run back through the just-sprayed field once again to reach the buses.

181.   FLC Fidencio conveyed PHI's order to the Workers.

182.   Receiving this Order, the Workers ran back through the field to get to the side where the buses were, causing additional exposure.

183.   The Workers, having fled the field again, gathered near the buses in a state of alarm, panic, anger and confusion.

184.   Many were experiencing immediate symptoms of exposure, including eye, skin, and throat irritation; numbness of their lips, mouth, or face; difficulty breathing; and headache.

185.   Some PHI managers asked the Workers how they felt.

186.   The sickest of the Workers, Adrian Perez, had to be helped off the field

by two other Workers, Luis and Miguel Sifuentes.

187.   Defendant PHI did not call an ambulance and had no medical personnel at the field to examine or treat any of the Workers.

188.   Defendant PHI did not offer any other transportation to a hospital or medical facility to any Workers, or provide Workers with names and locations of health facilities or hospitals where they could receive care.

189.   Defendant PHI did not provide adequate facilities for the Workers to decontaminate.

190.   Some of the Workers washed their hands, faces, and chests with the scant available water, because there were no designated decontamination facilities.

191.   Many Workers, however, did not rinse off in any way after the spray, and PHI managers did not direct or instruct them to do so.

192.   PHI managers and the Salinases took personal protective equipment, such as hats, gloves, and glasses, from Workers who reported they were sprayed.

193.   PHI managers and the Salinases then told the Workers to board the buses to return to the motels where they were staying, which they did.

194.   On the way back to the motels, many Workers were ill, with Adrian in particular showing severe signs of illness: red eyes, extreme weakness, gagging and retching.

195.   A worker asked FLC Fidencio if the bus could take Adrian straight to the hospital instead of returning to the motel.

196.   FLC Fidencio responded that the bus should just go back to the motel

as quickly as possible because Defendant PHI would have medical staff there to treat sick Workers once they arrived.

197. However, when the Workers arrived back at the motel, Defendant PHI had no medical personnel there.

198. The Workers waited at the motel for about another 30 minutes for medical personnel that never arrived.

199. One of Adrian's family members called an ambulance, which took Adrian to a hospital.

200. Other Workers drove themselves or otherwise obtained rides to a hospital to obtain medical attention.

201. FLC Fidencio told some of the Workers to go to the hospital if they felt ill.

202. Some of the Workers showered at the motel before they went to the hospital.

*Medical Treatment Following the August Event*

203. Some of the Workers received emergency medical care on August 5, 2019.[6]

204. The experience of the individual Workers and Children who sought medical assistance is set forth in more detail below.

205. Those who sought emergency medical attention went to either Carle

---

[6] Some of the Workers and family members also received care in the days that followed, or subsequent follow-up care, as stated below in the "Facts Relating To Specific Workers" Section.

Foundation Hospital ("Carle") or OSF Heart of Mary Medical Center ("OSF"), both located in Urbana, Illinois, approximately three to five miles from the Workers' motels.

206.    Defendant PHI had managers at both hospitals who interfered with the Workers' attempts to communicate to medical personnel.

207.    Brandon Gillen, PHI's Field Operations Manager, went to Carle hospital at around 6:15 P.M.

208.    Dylan Haun, PHI's Safety Supervisor, also went to Carle around that time.

209.    Later that evening, Haun went to OSF as well.

210.    At the hospitals, Gillen and Haun, acting as Defendant PHI's agents, falsely stated to medical personnel that the plane had not sprayed the Workers, and had turned around a quarter of a mile away from the Workers before spraying.

211.    Gillen and Haun had a visual display on a computer tablet that they claimed showed that the plane had sprayed a different field.

212.    On information and belief, Gillen requested and received this information from Defendant Farm Air.

213.    Gillen and Haun, acting as Defendant PHI's agents, falsely reported to medical personnel that the Workers had been decontaminated at the field, and some medical personnel therefore noted this incorrect information in their medical records.

214.    Gillen and Haun made statements to hospital staff that falsely

downplayed the level of exposure the Workers had experienced, and the Workers'
resulting symptoms.

215.    At OSF, Haun instructed the Workers to get letters from a doctor
permitting them to return to work ("return-to-work letters"), regardless of whether
they were well enough to do so.

216.    Haun insisted that the Workers obtain such letters.

217.    In Adrian's case, for example, Haun convinced a non-treating nurse to
provide a return-to-work letter stating he could work the next day, and the treating
doctor had to revise the letter the next day because Adrian was much too ill to work.

218.    Most of the Workers received such return-to-work letters clearing them
for work the following day regardless of whether they were in fact well enough to
work.

219.    Some of the treating medical staff gave the Workers forms intended to
be used to secure workers' compensation for their injuries.

220.    Haun argued with the staff, claiming that the Workers' injuries should
not qualify for workers' compensation.

*PHI's Subsequent Communication about the Exposures*

221.    Two days after the August Event, on August 7, 2019, Defendant PHI
called the Workers together at a field in which they were working.

222.    At that time, Defendant Haun, on behalf of Defendant PHI, made a
number of false claims about the August Event to the Workers.

223.    Defendant PHI claimed that spray seen coming from the plane was

actually smoke.

224.  Defendant PHI claimed there were no chemicals released over the field where the Workers had been working.

225.  Defendant PHI denied that the symptoms the Workers had experienced or continued to experience were related to chemical exposure during the August Event.

226.  Defendant PHI claimed that, after a thorough investigation, it had found that no one was sprayed with pesticides.

227.  Defendant PHI falsely claimed that all of those who had sought medical care were completely released to work with no restrictions and no symptoms.

228.  Defendant PHI claimed that if anyone sought medical attention, their symptoms were not related to the August Event, and that these non-work-related injuries would not be covered by workers' compensation.

229.  Defendant PHI also introduced its "field nurse," who had never before been available, and instructed the Workers to use her as a "resource" for any illness or injury that may occur.

230.  Workers at the meeting demanded to know what pesticides had been used by the plane they had seen.

231.  Haun stated he could show them "SDSs" (meaning Safety Data Sheets) for the pesticides on that plane, and briefly returned to his vehicle.

232.  However, when he came back, he said that under further guidance,

since the pesticides were not sprayed on the Workers, he did not have to show them the SDSs after all.

233.  Weeks after the event, the Workers made a formal request to Defendant PHI for pertinent information about the pesticides sprayed during the July Event and the August Event.

234.  The Workers sought the information in order to seek appropriate medical attention.

235.  Defendant PHI refused to provide the requested information.

*Chemical Safety Information*

236.  To date, the Workers have not identified the chemicals sprayed in the July Event, but believe they included (but may not have been limited to) Brigade 2EC (Bifenthrin), USEPA Registration No. 279-3313 ("Brigade") and Trivapro Fungicide, USEPA Registration No. 100-1613) ("Trivapro").

237.  The Workers have independently learned that the chemicals sprayed in the August Event included (but may not have been limited to) Avaris Fungicide 2XS, USEPA Registration No. 100-1324-5905 ("Avaris"); Coron 25-0-0 Fertilizer ("Coron"); and Sultrus Insecticide, USEPA Registration No. 5905-599 ("Sultrus").

238.  Brigade, Trivapro, Avaris, and Sultrus all meet the definition of pesticide in the FIFRA and are subject to its labeling requirements.

239.  Brigade, Trivapro, and Avaris's labels all provide the following first aid measures:

> If in Eyes: Hold eye open and rinse slowly and gently with water for 15-20 minutes. Remove contact lenses, if present, after the first 5

minutes, then continue rinsing eye. Call a poison control center or doctor for treatment advice.

If on Skin or Clothing: Take off contaminated clothing. Rinse skin immediately with plenty of water for 15- 20 minutes. Call a poison control center or doctor for treatment advice.

Brigade label at 1, available at

https://www3.epa.gov/pesticides/chem_search/ppls/000279-03313-20150828.pdf; *see also* Trivapro label at 3, available at

https://www3.epa.gov/pesticides/chem_search/ppls/000100-01613-20190206.pdf (containing the same first aid provisions, with slight wording variation); Avaris label at 2, available at

https://www3.epa.gov/pesticides/chem_search/ppls/000100-01178-20180614.pdf (same).

240.    Sultrus's label similarly requires avoiding contact with eyes or clothing, and requires rinsing eyes for 15-20 minutes and calling a poison control center if the product gets into eyes. Sultrus label at 1, available at https://www3.epa.gov/pesticides/chem_search/ppls/005905-00599-20170621.pdf.

241.    Brigade, Trivapro, Avaris and Sultrus's labels all forbid application "in a way that will contact workers or other persons, either directly or through drift. Only protected handlers may be in the area during application." Brigade label at 2; Trivapro label at 5; Avaris label at 6; Sultrus label at 4.

242.    All four labels indicate that workers should not be allowed to enter treated areas during the 12-hour restricted entry period. Brigade label at 3; Trivapro label at 6; Avaris label at 6; Sultrus label at 4.

35

243. Coron's label also requires rinsing for several minutes if the product gets into eyes, and "remov[ing] contaminated clothing and wash[ing] skin with soap and water," if on skin, and seeking medical attention if skin irritation occurs. Coron label at 1, available at https://s3-us-west-1.amazonaws.com/agrian-cg-fs1-production/pdfs/Coron_Metra_25_Label.pdf.

244. On information and belief, the chemicals sprayed in both the July and August Events were mixed with adjuvants and other chemicals intended, among other things, to make the pesticides easier to apply or more persistent, or to improve distribution on the intended crops.

245. On information and belief, the chemicals sprayed, either singly or in combination, caused each of the Workers and Children illness and injury.

## Facts Relating To Specific Workers

### Hada Garcia, Lidianelly Carreon Garcia, and David Carreon Vazquez

246. Around May of 2019, Hada learned of a job opportunity in Illinois for that summer.

247. On or around May 9, 2019, Hada and her then 20-year-old daughter, Lidianelly, met with the Salinases at their home in Alto Bonito, Texas, and signed employment-related documents, which were in English.

248. Hada also signed employment-related documents on behalf of her son, David, who was 17 years old at the time.

249. Hada does not speak or read English.

250. FLC Fidencio told Hada that PHI would cover the cost of housing.

36

251.    On or around July 5, 2019, Hada left Texas with seven family members, including Lidianelly and David. The family traveled in Hada and Lidianelly's two cars.

252.    FLC Arminda arranged for the family's housing: a motel room at the Candlewood containing two queen-sized beds. Because two beds did not suffice for eight people, some of the children slept on the floor.

253.    Hada found that her family's housing stipend did not cover the cost of the room as she had been told, and they had to pay about $130 in addition to the stipend each week.

*The July Event*

254.    In the late afternoon of July 23, 2019, Hada, Lidianelly and David were working in a field.

255.    David saw a helicopter spraying something and alerted Hada.

256.    Hada initially could not believe anyone would spray pesticides near them, particularly since she and the other Workers were visible because they wore large, neon orange hats.

257.    Hada, Lidianelly, and David all saw the helicopter flying nearby.

258.    Hada felt a slight mist from the spray.

259.    Hada, Lindianelly, and David heard the horns of the buses summoning them off the field, and ran off the field as fast as they could.

260.    Once they got out of the field, Hada heard others saying that the spray had been a pesticide.

37

261.    No one from Defendant PHI gave Hada, Lidianelly or David any information about the pesticide or pesticides, or advised them to decontaminate in any way.

262.    Nor did Defendant PHI provide Hada, Lidianelly or David with adequate facilities to decontaminate before they got on the bus.

263.    PHI's agents instead instructed the Workers to board the bus immediately, which they did.

264.    Soon thereafter, Hada, Lidianelly and David all started to experience symptoms, including bad headache.

265.    Lidianelly also felt nauseated.

266.    They each showered when they returned to the motel, but their symptoms persisted.

267.    Nevertheless, they all returned to work the next day.

268.    After and as the result of the July Event, Hada, Lidianelly and David continued to experience headaches and other related symptoms.

*The August Event*

269.    On August 5, 2019, in the afternoon, Hada, Lidianelly and David were working near each other.

270.    David saw a plane overhead and alerted his mother and sister to get out of the field.

271.    They all ran off the field quickly, running to the side opposite to where the buses were located.

272. They could smell a strong, bad chemical odor as they gathered and waited for instruction or direction from PHI.

273. PHI Fidencio and his son George Salinas were nearby, and had two-way radios.

274. Hada, Lidianelly and David saw and heard FLC Fidencio receive communication on his two-way radio.

275. FLC Fidencio then told them to go back to work in the field.

276. Hada asked George Salinas if it was really safe for them to return.

277. George Salinas then communicated by two-way radio with, on information and belief, a PHI manager, who confirmed the Workers were to go back into the field.

278. Hada, Lidianelly and David went back into the field and had worked part of the way into their row when they started hearing people yelling for them to get off the field again.

279. They were scared and ran off the field as fast as they could.

280. David felt a mist hitting him, enough to make his clothes damp.

281. Lidianelly could smell an odd smell and felt irritation in her eyes as she ran out of the field.

282. As she was running, Lidianelly fell and twisted her ankle before she was able to get off the field.

283. PHI managers told Hada, David, and Lidianelly to get on the bus, and the Workers returned to the motel.

284.    Defendant PHI did not provide them with adequate facilities to decontaminate before they got on the bus, and none of them did so.

285.    No one told them to wash off, either then or when they got back to the motel.

286.    On the bus, each of them experienced symptoms, including headache and nausea.

287.    Hada, Lidianelly and David each took a shower after they returned to the motel.

288.    The three of them continued to experience symptoms, including bad headaches and nausea.

289.    At the motel, someone they did not know was telling workers to go to the hospital if they were feeling ill.

290.    Hada, Lidianelly and David were all feeling ill, so they went to OSF.

291.    When they got there, the hospital staff seemed to be familiar with what had happened, as they had already seen other Workers.

292.    Defendant PHI managers, including, on information and belief, Dylan Haun, asked medical staff to give them "return-to-work" letters.

293.    Hada, Lidianelly and David received x-rays and over-the-counter medication, and letters stating they could return to work the next day.

294.    However, they felt too ill to return to work the next day, and also felt it would not be safe to do so.

295.    Hada therefore decided to return to Texas with her family.

296.    Hada, Lidianelly and David received no pay for any day after August 5, 2019.

297.    Hada, David, and Lidianelly continued to experience related physical and emotional effects of the August Event for months afterward, and they still experience some of those effects.

Mario H. Gonzalez

298.    In June 2019, Mario learned about a job opportunity in Illinois for that summer.

299.    Around that time, he met with FLC Arminda, at the Salinases' home in Alto Bonito, Texas, where he signed employment-related documents.

300.    The first week of July 2019, Mario made the two-day trip from Texas to Illinois in FLC Fidencio's SUV, with six other workers.

301.    In the summer of 2019, while working for Defendant PHI, Mario stayed in a single motel room with his cousin, Plaintiff Ramon Hernandez Jr., and two other people.

302.    Mario noticed that his checks were generally short four or five hours a week.

*The August Event*

303.    On August 5, 2019, Mario was working on one of Defendant PHI's fields when a plane passed overhead, spraying pesticides.

304.    Mario immediately left the field, and could smell a very strong smell.

305.    There was no water for him to wash up with, so he just got on his bus.

41

306. He waited about fifteen minutes, but then FLC Fidencio got on the bus to tell the Workers to return to work.

307. He went back into the field, and a few minutes later the plane came back and sprayed again.

308. Again, Mario ran off the field.

309. There was no water to wash up.

310. He boarded the bus and they returned to the motel, where he showered.

311. After and as a result of the August Event, Mario experienced symptoms including headache, fatigue and weakness, but he still went to work.

312. He did not go to the hospital because he had no car or other way to get there, and he understood that only the sickest people should go.

313. On August 7, 2020, a representative of PHI, Dylan Haun, confirmed to a group of Workers that PHI would not cover medical bills for symptoms the Workers were experiencing.

314. In the weeks that followed, Mario continued to feel related symptoms, but did not seek medical treatment because he did not have transportation or money to pay for such treatment.

315. Mario returned to Texas about ten days after the August Event.

316. For months afterward, Mario continued to experience symptoms as the result of the August Event, and he still experiences some of those symptoms.

Ramon Hernandez Jr.

317.    Ramon had worked summers for FLC Fidencio and Defendant PHI since about 1998.

318.    In 2019, Ramon took a public bus from McAllen, Texas to Champaign, Illinois.

319.    Ramon signed his work-related documents after arriving in Illinois.

320.    Ramon's Worker Disclosure and Information Sheet provided that he would earn $10 per hour.

321.    Ramon's first paycheck was short seven hours.

322.    Another paycheck during the course of Ramon's employment with Defendant PHI was short about five hours, and otherwise each check was short either three or four hours.

323.    Ramon understood that many other workers had missing hours of pay, and he believed he had no recourse at that time.

324.    Ramon stayed in one room with Mario and two other men, where he generally slept on the floor.

*The July Event*

325.    On July 23, 2019, Ramon entered the field when a helicopter passing overhead sprayed him.

326.    He immediately ran off the field.

327.    Ramon could see and smell the spray.

328.    He could also feel it hitting his face.

43

329.    He experienced symptoms including eye irritation and stinging lips, as well as nausea.

330.    Off the field, PHI managers urged Ramon and the other Workers to get on the bus and leave right away.

331.    They did not tell them to decontaminate first or provide them with adequate facilities with which to do so.

332.    No one called for medical assistance after this incident.

333.    Back at the motel, Ramon was able to shower, but had to wait his turn.

*The August Event*

334.    On August 5, 2019, Ramon again was working in a field when he was sprayed, this time by a plane passing overhead.

335.    Ramon felt a great deal of spray hitting him, but he was deep within a row and it took time to get off the field.

336.    Once off the field, others were boarding the buses, but Ramon stayed outside to try to get air.

337.    About ten minutes later, Ramon became aware of an order to return to the field, so Ramon returned.

338.    The airplane came back and sprayed them again, and Ramon fled the field again. In his rush to get off the field, he injured his knee.

339.    Ramon had been doused with spray, so that his clothes were wet.

340.    He began to experience symptoms, including his eyes and head hurting badly, his eyes watering, and a burning sensation on his face.

44

341.  Once off the field, PHI managers said that it was time to leave.

342.  Defendant PHI provided no way to shower at the field.

343.  Ramon did not go to the hospital that day, although other Workers did.

344.  That night, Ramon started to feel very ill.

345.  Among other things, his heart was racing, his head and eyes hurt, his face was burning, he felt weak, and he felt like he could not get enough air.

346.  By the next day, Ramon had developed a rash on his forearms, and still felt too ill to go to work.

347.  He sought treatment at Carle Hospital.

348.  Ramon received an x-ray and was prescribed an inhaler of albuterol for his respiratory symptoms and triamcinolone for the rash on his forearms.

349.  Ramon did not receive a letter stating when he could return to work.

350.  The doctor told Ramon he did not know when Ramon would be ready to return, and that Ramon would need a follow-up appointment for the doctor to make that determination.

351.  Ramon remained unable to work for several days, and missed at least four days of pay.

352.  Ramon (along with some others) worked for an additional week after the contract was scheduled to end.

353.  On the last day of work, the Workers returned to the motel at night, and FLC Fidencio said they could not spend the final night in the motel, or even take a final shower there before heading back to Texas.

45

354.     In all the years Ramon had worked for Defendant PHI, they had always allowed him to sleep in the motel after the last day of work and begin the drive back in the morning.

355.     That same night, after having worked all day, Alberto Sr. gave Ramon a ride back to Texas with the rest of the Montalvo family.

356.     Ramon continued to experience symptoms of illness as the result of the August Event for months afterward, and he still experiences some of those symptoms.

Alberto Montalvo Sr.

357.     In the spring of 2019, Alberto Sr. contacted FLC Fidencio about working in Illinois for the summer, as he had done the previous year, driving other workers from their lodging to the fields, between fields, and from the fields back to their lodgings.

358.     On or around May 4, 2019, Alberto Sr. met with the Salinases in Texas, along with his son Alberto Jr., who was 17 years old at the time, to sign employment-related documents.

359.     These documents included a Worker Disclosure and Information Statement that was the same as that which the other Workers had signed, except that the provision for pay at $9.25 per hour was crossed out, and $15.00 per hour was written in.

360.     While Alberto Sr. understood that he would be driving the bus, his Worker Disclosure and Information Statement indicated that he would be

46

detasseling and performing related tasks.

361.    Alberto Sr. drove himself, his wife, Alberto Jr., and two other minor
children (not parties) to Illinois, departing from Texas on July 3, 2019 and arriving
on July 5, 2019, two days before they were to start work.

362.    During their time in Illinois, all five members of Alberto Sr.'s family
stayed in a single motel room in the Candlewood, which had only two beds.

363.    The buses got very dirty from the fields, and Alberto Sr. considered it
his responsibility to keep the bus clean, but never received cleaning equipment from
Defendant PHI.

364.    He used his personal funds to buy trash bags to clean up the trash
people left from their lunches. He also bought his own broom to sweep the bus.

365.    For the first few weeks of work, Defendant PHI failed to pay him for
time spent driving the workers back to their lodging—his "clock" stopped when the
other Workers got off the field each day.

366.    Only after Alberto Sr. and others complained did Defendant PHI start
to pay him for this time.

367.    Alberto Sr. started work before the other Workers, arriving at the bus
each day about half an hour earlier to conduct a safety check.

368.    However, his paychecks did not reflect this work.

369.    In addition to these omissions, Alberto Sr. was missing two to three
hours of pay on about six other occasions in the middle and end of the season.

370.    On several of these occasions, Alberto Sr. brought the shortfall to FLC

Fidencio's attention, who then added some, but not all, of the missing hours to his next checks (*e.g.*, two of three missing hours).

371.  However, toward the end of the season, Alberto Sr. did not discuss the missing hours on approximately two of the checks and was never compensated for those hours of work.

### *The July Event*

372.  In the afternoon of July 23, 2019, Alberto Sr. had just taken a group of workers to the last field they were supposed to work that day.

373.  Alberto Sr. saw a helicopter spraying a field right next to where Workers were working.

374.  Alberto Sr. started honking the horn of his bus to call the workers off the field.

375.  Alberto Sr. used his bus to pick up Workers who had left the field on the opposite side.

376.  Workers boarded the bus directly, without washing themselves off first.

377.  Defendant PHI did not provide the Workers with adequate facilities to decontaminate before they got on the bus.

### *The August Event*

378.  In the late afternoon of August 5, 2019, Alberto Sr. saw and heard an airplane that appeared to be passing over the field the Workers were in.

379.  Alberto Sr. could see that it was spraying a liquid.

380. Alberto Sr. went to look for a PHI safety supervisor, but could not find one.

381. After a few minutes, multiple PHI safety supervisors appeared and told the drivers to get the workers out, so Alberto Sr. started honking his horn.

382. From where he was, off the field, Alberto Sr. could smell pesticides very strongly.

383. After and as the result of the August Event, Alberto Sr. experienced reactions including eye irritation, nose irritation, and coughing.

384. FLC Fidencio told the Workers to shower and wash their clothes once they got back to the motel.

385. That evening, Alberto Sr. and Alberto Jr. went to OSF Hospital. They were frightened after seeing people who were extremely ill, and Alberto Jr. was experiencing symptoms, including seeming disoriented.

386. At OSF, Alberto Sr. received a diagnosis of errythemidis sclera, redness and inflammation of his eyes. He also received an x-ray.

387. The doctor gave him a letter stating he could return to work the next day.

388. Alberto Sr. and his family returned to Texas about one week after the contract was supposed to end.

389. For months after the August Event, Ramon continued to experience related symptoms of illness, and he still experiences some of those symptoms.

Alberto Montalvo Jr.

49

390.    In the spring of 2019, Alberto Jr.'s father, Alberto Sr., contacted FLC Fidencio about working in Illinois for the summer, as he had done the previous year.

391.    Alberto Jr. went along with Alberto Sr. to sign their work-related documents in Texas.

392.    Alberto Jr. traveled to Illinois with Alberto Sr., as well as his mother and two siblings (not parties), departing from Texas on July 3, 2019 and arriving on July 5, 2019, two days before they were to start work.

393.    During their time in Illinois, all five members of Alberto Jr.'s family stayed in a single motel room in the Candlewood.

394.    During the middle of the summer, about five of Alberto Jr.'s checks were short about five hours each.

395.    On several occasions, he pointed out the shortfall to FLC Fidencio, who would add some, but not all, of the shortfall to his next check.

396.     However, toward the end of the season, Alberto Jr. did not discuss the missing hours on approximately two of the checks and was never compensated for those hours of work.

*The July Event*

397.    In the afternoon of July 23, 2019, Alberto Jr. was working in a field when he saw a helicopter pass over him.

398.    Alberto Jr. heard people start yelling.

399.    Moments later, he heard buses honking their horns, which he knew

50

meant the workers should get off the field.

400.    He did so, but left on the side opposite to where the buses were.

401.    In that area, PHI provided no facilities for washing up, and he had to wait there until the buses came to pick him up, along with other Workers who had left the same way.

402.    The bus ride back to the motel took about 45 minutes, and he was not able to shower until he got back to his room.

*The August Event*

403.    On August 5, 2019, Alberto Jr. was working in a row by himself when he saw a plane passing overhead.

404.    Alberto Jr. smelled a strong chemical odor, and he ran off the field.

405.    After other Workers came off the field, PHI managers were trying to determine who had been hit by spray, and Alberto Jr. let them know he may have been hit by spray.

406.    PHI provided no shower, just a small hose that the Workers would use to wash their hands.

407.    He could not take all of his clothes off because there was no privacy, so he took off only his shirt, leaving his pants, socks and shoes on.

408.    He washed his upper body with cold water and dish soap.

409.    Alberto Jr. then saw that Workers were returning to the field and understood that a PHI Safety Manager had ordered the Workers to return.

410.    However, Alberto Jr. did not go back into the field after he finished

washing up.

411.   Alberto Sr. told Alberto Jr. to sit on the bus, and he did.

412.   Alberto Jr. started experiencing symptoms, including a bad headache.

413.   Defendant PHI provided no blanket or towel after he has washed down with a hose, so he remained cold and wet during the entire trip back to the motel.

414.   Once they arrived back at the motel, Alberto Jr. and his father felt scared about what had happened, and decided to go to OSF Hospital.

415.   Alberto Jr. was experiencing a range of symptoms, including headache and nausea, and he felt dizzy, light-headed and confused.

416.   Alberto Jr. received chest x-rays and Meclizine, a medication for the nausea and dizziness.

417.   A doctor gave him a letter stating he could return to work the next day.

418.   However, the next day, Alberto Jr. felt too sick to work, so he stayed at the motel. He was not paid for that day.

419.   After and as the result of the August Event, Alberto Jr. continued to experience related symptoms.

420.   He and his family returned to Texas about a week after the contract ended.

Consuelo Diana Perez, Adrian Perez, and A.P.

421.   Around June of 2019, as she had done in the past, Consuelo contacted FLC Arminda, saying she and her family needed work for the upcoming summer.

422.    Consuelo had to miss an appointment to register, and when she called to reschedule, she learned that no more openings remained.

423.    Consuelo managed to secure another job in Indiana, where she traveled with her children, Adrian (then 17 years old) and A.P. (then 15 years old) and three non-party family members.

424.    On July 7, 2019, when they arrived in Indiana, Consuelo learned that Adrian and A.P. would not be permitted to work, so she called FLC Arminda again to see if any jobs had opened.

425.    FLC Arminda told her that there was work for Consuelo, Adrian, and A.P., so Consuelo drove with her family to Illinois the next day.

426.    On or around July 7, 2019, in Illinois, Consuelo signed employment-related documents on behalf of herself as well as Adrian and A.P., including Worker Disclosure and Information Statements.

427.    The Salinases told Consuelo that she and her family would stay at the WoodSpring, and that she would receive a stipend in her paycheck to cover the motel.

428.    Each week, FLC Fidencio told Consuelo how much they owed for the motel; Consuelo paid him, and he paid the motel.

429.    Consuelo, A.P., and another family member stayed in one room, and Adrian stayed in another room with other family members.

430.    During the course of the summer, Consuelo, Adrian and A.P. each occasionally noticed that their checks were short some hours of pay.

431.   Each of them had this occur on approximately two separate occasions.

432.   Each time this occurred, they pointed out the shortfalls to FLC Arminda, who added the missing hours to the next week's check.

*The August Event*

433.   On August 5, 2019, Consuelo, Adrian and A.P. were all working in a field.

434.   A.P. had just finished her row and was waiting for Consuelo to come out when a PHI manager warned her that there was a plane overhead.

435.   She called Consuelo to get out of the field.

436.   Consuelo ran out of the field and caught up to A.P.

437.   Adrian saw the plane but did not realize what was happening, and he finished working through his row.

438.   When he came off the field, one of the workers known as "pushers," whose job it was to manage workers in the rows, let him know that some workers were going back to the buses, but he should wait to see if he should go back in or not, so he waited there.

439.   Consuelo and A.P., meanwhile, were on their way back to the bus.

440.   As they walked toward the bus, A.P. heard a PHI manager tell FLC Arminda to put the workers back into the field.

441.   Consuelo, who has asthma, was experiencing symptoms, including having trouble breathing. She was afraid, because her asthma is usually controlled.

442.   Consuelo and A.P. boarded the bus.

54

443.  A PHI manager came onto the bus and asked people if they felt ill.

444.  Consuelo said she did, and the manager told her to rinse off with water.

445.  Consuelo got off the bus to wash up, and A.P. went with her.

446.  A.P. did not want to go back into the field without Consuelo, so she walked with her to where the water was.

447.  On the way, A.P. and Consuelo saw Adrian near a row.

448.  The pusher had told him to go back in, and he was getting ready to do so.

449.  Consuelo told A.P. to go with her brother.

450.  Adrian and A.P. returned to the field.

451.  Consuelo did not feel well enough to go with them, but after washing up, she also returned to the field.

452.  After a time, Consuelo heard a girl screaming, and everyone was called off the field again.

453.  Adrian and A.P. both exited the field on the side opposite to where the buses were.

454.  After they emerged on that side, however, they heard a worker speaking by two-way radio to FLC Fidencio.

455.  Adrian and A.P. could hear FLC Fidencio on the worker's two-way radio indicating that PHI management told him to have the Workers go back through the field.

55

456.     The worker asked whether FLC Fidencio was sure, and he again indicated PHI management said they were to go through the field.

457.     Adrian and A.P. started returning back through the field, a walk that takes about 15 or 20 minutes.

458.     A.P. began to feel symptoms including nose, eye, and skin irritation.

459.     Adrian started to feel symptoms including dizziness and nausea; he started to cough and gag, and he fell.

460.     Adrian struggled to get out of the field until two other Workers, Luis and Miguel, came to help him get up, and they brought him to a water station.

461.     When he came out of the field, Adrian continued to experience exposure effects, including red and watering eyes.

462.     A PHI manager told him to wash his face, giving him some dish soap.

463.     The first water station he tried did not work, so he went to the other to drink.

464.     Adrian washed his face with soap and water before getting back on the bus.

465.     Consuelo, meanwhile, was also experiencing symptoms, including irritation of her nose, throat, skin and eyes, and continued to have difficulty breathing.

466.     A.P. was also experiencing effects of the event.

467.     Once on the bus, Adrian felt very ill. His eyes were still red and watering, and he was experiencing additional symptoms, including gagging and

feeling faint.

468.    Consuelo told another worker she was afraid, and that worker, seeing how ill Adrian was, called FLC Fidencio to ask whether they could go to a hospital instead of returning to the motel.

469.    FLC Fidencio responded that they should just go straight to the motel, and that the healthcare staff of Defendant PHI would come and treat Adrian there.

470.    FLC Fidencio told them not to call an ambulance.

471.    When they arrived at the motel, they found that Defendant PHI had no healthcare workers there.

472.    By this time, Adrian's symptoms included extreme pallor as well as dizziness, gagging, retching and vomiting.

473.    He also had an open cut on his arm that did not exist before the event.

474.    Consuelo and A.P. feared Adrian was dying.

475.    Consuelo called FLC Fidencio and told him they needed to call an ambulance, and he told her to do what was needed.

476.    A family member called for an ambulance.

477.    An ambulance arrived, and healthcare workers gave Adrian oxygen.

478.    Consuelo went with Adrian in the ambulance to OSF.

479.    After the ambulance took Consuelo and Adrian to OSF, A.P.'s older sister drove A.P. there in Consuelo's car.

480.    Consuelo, Adrian, and A.P. saw Dylan Haun and FLC Fidencio's son George at OSF.

57

481.   Haun berated Consuelo for calling the ambulance.

482.   Haun told medical staff that the Workers were not injured.

483.   Health care providers at OSF gave Consuelo, Adrian and A.P. chest x-rays and discharged them.

484.   After Consuelo, Adrian and A.P. were discharged, they had just arrived back at the motel when FLC Fidencio called Consuelo, and said Haun needed the family to return to the hospital to so that he could examine their discharge papers.

485.   When Consuelo arrived back at the hospital, Haun was talking to the hospital staff member who had registered her family.

486.   Consuelo, Adrian and A.P.'s discharge papers did not say when they could return to work.

487.   Haun stated he wanted to speak to Adrian's doctor, and wanted to know why they had been placed "in workers' comp."

488.   Adrian's doctor, Dr. Kole, had gone home, and Haun asked to see a supervisor.

489.   A nurse then gave Consuelo, Adrian and A.P. return-to-work letters that indicated that Dr. Kole had cleared them all to return to work the next day.

490.   However, Adrian continued to be very ill that night, and the next day, his nausea was worsening, among other symptoms, so Consuelo brought him back to OSF.

491.   Adrian's doctor asked Consuelo why she had allowed Adrian to return to work, saying he should not have been permitted to return.

58

492.    Consuelo showed him Adrian's return-to-work letter, which indicated that Adrian should be well enough to work to work that day. (She had not, in fact, allowed him to return to work, as he was far too ill.)

493.    Adrian was the only family member to receive treatment on August 6, 2019.

494.    On August 6, 2020, Dr. Kole ordered bloodwork and an x-ray.

495.    Adrian also received prescription anti-nausea medication that day.

496.    On August 6, 2019, the doctor gave Adrian a letter indicating he should be off work from August 6, 2019 through August 8, 2019, and that he could return to work on August 9, 2019.

497.    After about a week Adrian tried to return to work, but found he was too ill to work due to symptoms related to the August Event, particularly from gagging and nausea he continued to experience.

498.    Consuelo missed about four days of work, both because she herself did not feel well enough to return, and because she needed to take care of Adrian.

499.    Consuelo worked a total of about one more week after the August Event, to the end of the season, before the family returned to Texas.

500.    After and as the result of the August Event, Consuelo, Adrian, and A.P. continued to experience related physical and emotional effects for months, and they still experience some of those effects.

<u>Liliana Rodriguez, E.R., Patricia Rodriguez, V.A., and Vanessa Guzman</u>

501.    In spring of 2019, Liliana learned of an employment opportunity in Illinois that summer.

502.    Liliana drove to Illinois with her two daughters, E.R. (then 15 years old) and Patricia (then 16 years old); her nephew, V.A. (then 15 years old); and her niece, Vanessa (then 17 years old), in Liliana's car.

503.    Liliana spoke to FLC Fidencio in Texas and received documents there, but Liliana signed new employment-related documents on behalf of herself or her minor family members, and received Written Disclosure and Information Sheets, on or around July 11, 2019, after the family had arrived in Illinois.

504.    Liliana's Written Disclosure and Information Sheet was in English only.

505.    Liliana does not read or speak English.

506.    Liliana also signed Written Disclosure and Information Sheets on behalf of E.R., Patricia, V.A., and Vanessa, and those sheets were also in English only.

507.    While in Illinois, Liliana, E.R., Patricia, V.A., and Vanessa stayed together in a single motel room at WoodSpring, which had two beds. Usually Liliana and the girls slept in the beds and V.A. slept on the floor.

508.    On two occasions Patricia's checks did not reflect all the hours she worked. The first time, around the middle or end of July, she was missing four

60

hours, and the second time, around the middle of August, she was missing about three hours.

509. Liliana spoke to FLC Fidencio about the missing hours, but he refused to pay her for those hours.

*The July Event*

510. In the afternoon of July 23, 2019, Liliana, E.R., Patricia, V.A. and Vanessa were all working in a field.

511. Liliana and Patricia were working not far from each other.

512. E.R. and Vanessa arrived slightly later, and had just begun working in their rows.

513. Liliana went to take a bathroom break in a portable toilet just outside the field, not far from where she was working.

514. She noticed a helicopter nearby, but did not think there was any danger, because they were so visible in their orange hats.

515. After Liliana left, Patricia saw the helicopter fly overhead again and smelled a strong, bad odor.

516. Patricia ran off the field to the portable toilets where Liliana was and started knocking on the door, to tell her to come out so they could get on the bus.

517. When Liliana came out of the portable toilet, they both could see the helicopter spraying.

518. Liliana and Patricia felt the spray hitting their faces.

519. Liliana could feel her mouth and lips becoming numb.

61

520.   Liliana, Patricia, and the other Workers who had already gotten off the field took their neon orange hats and were waiving them at the helicopter to signal that people were still in the field.

521.   E.R. and Vanessa had arrived to the field slightly later than their family members, and had just started working on their row when they heard the buses' horns honking, which they knew meant to get out of the field.

522.   Vanessa felt a mist hit her.

523.   She and E.R. ran. She looked for other family members but could not find them.

524.   Vanessa could feel her face began to sting.

525.   V.A. also saw the helicopter pass overhead, and felt a spray mist hitting his arms, where he had rolled up his sleeves.

526.   V.A. immediately ran off the field.

527.   They could smell an extremely strong, bad smell, which caused symptoms including bad headache and nausea.

528.   After Liliana, Patricia, E.R. and Vanessa left the field, they all got directly on the bus.

529.   Defendant PHI did not provide Liliana, Patricia, E.R. and Vanessa with adequate facilities to decontaminate before they got on the bus.

530.   People were saying the spray had been pesticides, and Vanessa ran off the bus again to find a way to wash her face and hands. She only rinsed with water because there was no soap.

531.    Her skin felt irritated, so she took off her outer shirt, but she could not take off the rest of her clothes because there was no privacy.

532.     There was nothing else she could do for relief.

533.     V.A. was able to wash his face and hands, and he took off the outer layer of his clothing before boarding the bus.

534.    Someone told Liliana to take a bottle of water that was on the bus and use it to rinse her mouth and lips, which she did. She also took off her outer shirt.

535.    Otherwise, she was not able to rinse off at that time.

536.    Patricia also used some drinking water from a water bottle to rinse her face and hands on the bus.

537.    Immediately after and as the result of the July Event, Liliana experienced symptoms including numbness of her face, bad headache, eye irritation, and nausea.

538.    E.R. also experienced related symptoms, including, during the bus ride back to the motel, a nosebleed.

539.    Patricia also experienced related symptoms, including numbness of her mouth and tongue, bad headache, dizziness, and nausea.

540.    V.A. also experienced related symptoms, including eye irritation and chest tightness.

541.    Vanessa also experienced related symptoms, including skin irritation.

542.    All five family members took turns showering after they returned to the motel.

63

543. They washed everything they had worn that day.

544. Patricia tried to eat but vomited.

545. The next morning, E.R. also vomited and could not eat.

546. No one in the family felt well enough to work.

547. E.R. nonetheless did go to work that day, but the rest of the family did not.

548. Liliana told FLC Fidencio they could not work, which angered him.

549. In the days following the July Event, Liliana's symptoms included skin irritation and blisters filled with clear fluid.

550. Liliana's arms looked like they had suffered burns.

551. Over the following two weeks the condition worsened and became more painful.

552. Very soon after the July Event, Vanessa started to experience resulting symptoms, including very bad migraines and nausea.

553. After and as a result of the July Event, Liliana, E.R., Patricia, V.A. and Vanessa all felt continuing physical and emotional effects.

554. In particular, over the next few weeks, V.A.'s eye irritation and chest tightness continued with such severity that he could not work or sleep.

555. The family's illness caused them to miss a lot of work in the weeks following the July Event.

556. Liliana sought treatment for the family during this time, calling local clinics, but they either did not have available appointments, did not treat eye

conditions, or did not speak Spanish.

557.  On or around August 8, 2019, Liliana contacted Dylan Haun, PHI's Safety Supervisor, by calling him from the motel.

558.  Vanessa interpreted Spanish to English for Liliana.

559.  Liliana told Haun that V.A. and other family members were ill, and he responded by telling her that he did not care what happened to them, and then hung up.

560.  Shortly after that, Liliana and V.A. saw another PHI manager in the lobby, and asked him for help.

561.  That PHI manager did not help them either.

562.  On August 8, 2019, Liliana took V.A. to the emergency room at Carle Hospital so that his eyes could be treated.

563.  V.A. received a diagnosis of bacterial conjunctivitis and a prescription for erythromycin.

564.  The doctors gave V.A. a letter stating he could return to work August 11, 2019.

565.  On August 10, 2019, FLC Fidencio was angry and abusive toward Liliana, saying her family members were not working enough, and he told them to leave immediately.

566.  Liliana then left Illinois with her family to return to Texas.

567.  On August 16, 2019, V.A. saw a doctor at Edinburg Vision Center in Edinburg, Texas, who examined V.A. and diagnosed him with acute atopic

conjunctivitis in both eyes, for which he prescribed neomycin; and anterior uveitis in both eyes, for which he prescribed cyclopentolate.

568.    V.A. did not have a history of these conditions.

569.    Liliana, E.P., Patricia, V.A., and Vanessa continued to experience related physical and emotional effects of the July Event for months afterward, and they still experience some of those effects.

Gilbert Sanchez Jr.

570.    In the spring or early summer of 2019, Gilbert learned about a job opportunity in Illinois that summer.

571.    He spoke to FLC Fidencio on the phone and Fidencio sent him his Worker Disclosure and Information Statement.

572.    The Worker Disclosure and Information Statement provided that he was to receive a stipend of $120 upon arrival.

573.    Gilbert took a public bus from Texas to Illinois.

574.    Gilbert did not receive his $120 stipend upon arrival (or at any time).

575.    In Illinois, Gilbert shared a room with his friends, Miguel and Luis, and one other man they did not know.

576.    The Salinases required that they stay four to a room, and were therefore forced to stay with a stranger.

577.    Gilbert paid FLC Fidencio in cash for the motel.

578.    Gilbert noticed that about two of his checks were missing hours, which he never recovered.

66

*The August Event*

579.    In the afternoon of August 5, 2019, Gilbert was working in one of PHI's fields when suddenly a plane passed overhead spraying pesticides.

580.    The pesticide spray hit his body.

581.    Gilbert ran off the field and reported what happened to several managers.

582.    Gilbert told them that he had been hit by a lot of pesticides, and they told him to wash up with soap and water.

583.    Gilbert was able to wash his face, arms, and torso, but he did not shower completely. He had to keep his pants on because there was no privacy.

584.    After washing off, he boarded the bus.

585.    After and as the result of the August Event, Gilbert experienced a range of symptoms.

586.    Among other things, he felt dizzy and exhausted, and was spitting up blood. He vomited several times, and his face was swollen and itchy.

587.    The next day, Gilbert could not work and still felt ill and very nauseated, and he decided to go to Carle Hospital.

588.    His roommate, Luis Sifuentes, was also very ill, so Gilbert took him along.

589.    At the hospital, medical staff took an x-ray, finding "small nodular densities," and administered a blood test.

590.    Gilbert's blood test indicated an abnormality, low creatinine, and the

doctor told him to drink a lot of water to address this problem, which can be caused by water loss.

591.   The doctor treating Gilbert prescribed azithromycin, Benadryl, and diphenhydramine.

592.   In the weeks and months that followed, Gilbert continued to experience symptoms of illness resulting from the August Event, some of which he continues to experience.

Luis Alonzo Sifuentes and Miguel Sifuentes

593.   In spring of 2019, Luis and Miguel learned of an opportunity to work in Illinois that summer.

594.   They called FLC Fidencio, who told Luis and Miguel to come to the Salinas home in Texas, where they discussed the position with Arminda Salinas and signed employment-related documents.

595.   Luis and Miguel left for Illinois around the first week of July, carpooling with another worker in that worker's pickup truck.

596.   When they arrived in Illinois, they met FLC Fidencio, who showed them to their lodging at WoodSpring.

597.   They shared a single room with their friend, Gilbert, and one other worker they did not know. Since there were only two beds in the room, two workers slept on the floor each night.

598.   Luis's checks were nearly always short one or two hours per day he worked, which added up to about eight to ten hours per week.

599.   Miguel's checks were nearly always short one or two hours per day he worked, which added up to about eight to ten hours per week.

*The July Event*

600.   On July 23, 2019, in the afternoon, Luis and Miguel were both at work in a field when a helicopter came by, lowered, and sprayed.

601.   Luis and Miguel could see a substance falling from the helicopter, and they could feel a mist hitting them.

602.   They ran off the field.

603.   Defendant PHI did not provide Luis and Miguel with adequate facilities to decontaminate before they got on the bus, and neither of them did so.

604.   Neither Luis nor Miguel were able to shower until they returned to the motel.

605.   After and as the result of this event, both Luis and Miguel experienced related physical and emotional effects.

*The August Event*

606.   On August 5, 2019, also in the afternoon, Luis and Miguel were both working in one of Defendant PHI's fields.

607.   Luis and Miguel both saw an airplane spraying overhead.

608.   They were both sprayed so thoroughly that their clothes felt wet. The substance had a strong smell.

609.   When they realized what was happening, they ran off the field as quickly as they could.

69

610.    After some time, FLC Fidencio told them to go back to work, so Luis and Miguel went back into the field.

611.    Luis's clothes were still wet, and the smell was extremely strong.

612.    Miguel started feeling sick after returning to the field.

613.    Luis and Miguel saw the plane return and fly over the buses.

614.    When they heard the buses' horns honking, they again ran off the field.

615.    Luis and Miguel both exited the field on the side opposite to where the busses were.

616.    When they emerged on that side, the pushers directed them to walk back through the field to get to the side where the buses were.

617.    Luis and Miguel saw Adrian Perez coughing and gagging, and then fall, so they helped him get up and out of the field.

618.    While they were off the field, they were preoccupied with trying to help Adrian.

619.    Defendant PHI did not provide Luis and Miguel with adequate facilities to decontaminate, or even direct or instruct them to rinse off in any way, and they did not do so.

620.    PHI did not provide them with any medical attention at the field or offer to transport them to a health facility.

621.    After trying to help Adrian, they left him with his family and the FLCs.

622.    Miguel started to experience symptoms including dizziness and

70

fatigue, and needed to sit down.

623.  Luis and Miguel both boarded the bus to go back to the motel.

624.  After arriving back at the motel, Luis and Miguel continued to try to help Adrian and his family until an ambulance came.

625.  Luis and Miguel gave Adrian water and milk to drink so that he would throw up the poison he had ingested.

626.  Adrian did throw up.

627.  After the ambulance came to bring Adrian to the hospital, Luis and Miguel showered and changed their clothes.

628.  By that time, about three hours had passed since they had been sprayed.

629.  Luis was experiencing a range of symptoms, including a bad sore throat, and he also started vomiting and suffering from diarrhea about every 20 minutes.

630.  Miguel was also feeling extremely ill, with a range of symptoms including exhaustion, chest pain, stomach pain, headache, and diarrhea. He felt weak and faint.

631.  Miguel did not go to the hospital, because he understood that Defendant PHI was only bringing the most severely ill people to the hospital, and he worried that he could not afford to pay the bill.

632.  The next day, Luis was still experiencing symptoms including a sore throat and headache, and he had developed a rash on his wrists. He was also still

71

suffering from diarrhea every hour.

633.   Luis could not work that day.

634.   Gilbert had a car, so Luis went with Gilbert to Carle Hospital.

635.   Luis told the doctor about the exposure that had occurred the day before.

636.   Because staff at Carle had been there the day before when other Workers had reported being sprayed, the doctor treating Luis was able to tell him the pesticides that had been used.

637.   The doctor stated that Luis's symptoms were very likely due to exposure to those pesticides.

638.    The doctor prescribed Luis Ioperamide for diarrhea and Triancinolene for his rash.

639.   The doctor told Luis to go home and rest, and he received a letter stating he should not work for one week, so he did not.

640.   He received no pay for the days of work that he missed.

641.   After and as the result of the August Event, Luis continued to feel ill.

642.   Luis continued to take his prescribed medications for months after the August Event, as his symptoms continued.

643.   Some symptoms continued even after Luis completed his course of medications, and some still continue.

644.   After and as the result of the August Event, Miguel also continued to feel ill.

72

645.    Miguel did not miss any days of work after the August event, but on one day was so ill that he spoke to a PHI safety manager on site, who told him he could rest for a while on the bus.

646.    Miguel continued to experience related physical and emotional effects of the August Event for months afterward, and he still experiences some of those effects.

Ediel Tanguma Trevino

647.    In May 2019, FLC Fidencio recruited Ediel to do detasseling work for Defendant PHI.

648.    Ediel met FLC Fidencio at the Salinases' home in Alto Bonito, Texas, and signed employment-related documents there.

649.    Ediel's Worker Disclosure and Information Statement indicated that he would be detasseling and performing related tasks.

650.    On July 3, 2019, Ediel drove one of FLC Fidencio's SUVs to Illinois, taking three other workers with him.

651.    While in Illinois, Ediel and two other men stayed in a room with two beds. He and the two other workers took turns sleeping on the beds and sleeping on an air mattress they had purchased.

652.    For the first few weeks of his employment, FLC Fidencio had Ediel haul the portable toilets in the same SUV he had driven from Texas from field to field.

653.    On one occasion Ediel noticed that pay for several hours were missing

from his paycheck; he notified FLC Fidencio, who added pay for those hours to his next check.

*The August Event*

654.    In the afternoon of August 5, 2019, Ediel was working in a field detasseling corn.

655.    As he was working, Ediel saw an airplane pass over him, spraying, and heard other workers start screaming.

656.    Ediel's clothes were wet from the spray.

657.    Ediel ran out of the field.

658.    FLC Fidencio was nearby to where Ediel came off the field.

659.    FLC Fidencio told Ediel that the spray was nothing bad.

660.    After about 15 minutes, Ediel heard FLC Arminda tell FLC Fidencio by two-way radio that a "safety" had told her to tell the Workers to go back into the field.

661.    FLC Fidencio told Ediel and the other Workers to go back into the field to work.

662.    Ediel returned to the field to work.

663.    While in the middle of a row working, Ediel heard screaming again. He was confused, so he again left the field.

664.    The plane came back, and was flying low.

665.    Ediel smelled an odd smell, and as he was running out, Ediel's eyes hurt very badly, and he could barely see.

666.     Once he got out, Ediel waited with other Workers to receive soap to wash with.

667.     A safety gave him soap and told him to wash his arms.

668.     Ediel washed his face, arms, and hands.

669.     Ediel's eyes were red. He felt blinded, and his mouth felt so numb that he could not talk.

670.     Ediel also experienced a range of other symptoms after and as the result of the August Event, including irritation of his skin, which hurt and stung.

671.     After the bus ride back to their motel, Ediel washed up.

672.     While other Workers went to the hospital that evening, Ediel did not go, because he had no transportation, and he feared he would lose his job if he went.

673.     Among other symptoms, Ediel could still barely talk. His skin felt cold and his eyes still appeared very red.

674.     Ediel felt too ill to work the next day, but did not miss any days of work after that. He was not paid for his one sick day.

675.     Ediel continued to experience physical and emotional effects of the August Event for many months afterward, and he still experiences some of those effects.

Judith Valdez and S.V.

676.     In the spring of 2019, Judith learned about an opportunity to work in Illinois that summer, and contacted FLC Fidencio.

677.     On or around May 9, 2019, she and her then 15-year-old daughter,

S.V., met with FLC Fidencio in Texas to sign employment-related documents.

678.    Judith also signed on behalf of her daughter, S.V.

679.    Around the first week of July 2019, Judith and S.V. made the trip to Illinois together by car.

680.    During their time in Illinois, Judith and S.V. lived in a single motel room.

681.    On several occasions, Judith noticed that their checks were short some hours of pay.

682.    When she pointed out the shortfalls to FLC Fidencio, he added the missing hours to their checks for the following week.

*The July Event*

683.    In the afternoon of July 23, 2019, Judith and S.V. were about to enter a field to work when they saw a helicopter that was spraying pesticides on another field nearby.

684.    S.V. saw the helicopter fly over the field they were about to enter, and heard the bus drivers honking their horns to notify workers to leave the field.

685.    S.V. and her mother tried to tell the other workers to get out of the field.

686.    S.V. saw spray coming out of the helicopter.

687.    After this incident, no one told them to wash off or seek medical attention.

688.    They simply boarded the buses and returned to the motel.

*The August Event*

689.   In the afternoon of August 5, 2019, Judith and S.V. were working in a field when S.V. saw a plane and called out to her mother.

690.   They both saw the plane flying low and watched as it passed overhead.

691.   Judith and S.V. both saw spray coming from the plane.

692.   As they ran out, Judith felt liquid make contact with her face and neck, and smelled a strong smell.

693.   S.V. also felt a mist hitting her, mostly on her face and neck.

694.   They both fled the field as quickly as possible.

695.   Judith started to feel odd and sick.

696.   After and as the result of the August Event, Judith felt a range of symptoms, including red and burning eyes, numbness of her lips, and dry mouth.

697.   She also felt her throat closing, making it hard to breathe, and she could not stop blinking, as her eyes felt very dry and they hurt.

698.   After and as the result of the August Event, S.V. also felt a range of symptoms, including a burning sensation on her lips and face and a rash on her neck.

699.   They saw FLC Fidencio after they exited the field.

700.   FLC Fidencio told Judith and S.V. that there was soap and water on the side of the field opposite to the side where they had run off.

701.   They therefore went back through the field to get to that side, so they could wash off.

702.  FLC Fidencio crossed through the field that way as well.

703.  When they reached the other side, PHI managers asked them if they were OK.

704.  Judith and S.V. waited for FLC Arminda, who had left to retrieve soap, and then rinsed and washed their hair, faces and necks, taking off their outer clothes.

705.  Around the time Judith and S.V. were washing up, they began to experience additional symptoms, including dizziness.

706.  When they were finished washing up, FLC Arminda told them to get on the bus.

707.  As they walked to the bus, Judith saw and heard FLC Fidencio receive a call and say something to the effect of, "You want me to send them back in?"

708.  FLC Fidencio then walked ahead of them and told a group of workers to go back in.

709.  Judith and S.V. did not return to the field, instead boarding the bus.

710.  Defendant PHI provided them with no medical assistance of any kind at the site.

711.  When they got back to the motel, Judith and S.V. took turns showering.

712.  Both were experiencing a range of symptoms, including nausea.

713.  Both of them vomited.

714.  Judith was afraid for herself and S.V., so Judith decided they should

both go to the hospital.

715.   Judith did not feel well enough to drive, so another worker drove them to OSF.

716.   Medical staff examined Judith and performed an x-ray.

717.   By this time, S.V.'s eyes were red and inflamed, and she was still experiencing other symptoms, including nausea and dizziness.

718.   Staff at OSF gave Judith and S.V. an x-ray and eye wash.

719.   While at OSF, Judith saw a manager of PHI (on information and belief, Dylan Haun), arguing with a nurse, saying that the hospital had failed to provide return-to-work letters to the Workers.

720.   This PHI manager stated there was nothing wrong with Judith and S.V.

721.   Hospital staff then gave them letters stating they could go back to work the next day.

722.   Judith and S.V. both felt ill the next day, but they went back to work anyway.

723.   Judith and S.V. continued to experience related physical and emotional effects of the August Event for many months afterward, and they still experience some of those effects.

Jesus Javier Zuniga Silva; Yadira Zuniga; Ja.Z.; J.J.Z.; Jose E. Zuniga; Jennifer
Zuniga; the Hernandez Children; Maria Abigail Zuniga; and the Casarez Children

724.    For over a decade before 2019, Jesus Javier and various members of
his family had worked for Defendant PHI, under various FLCs.

725.    In about June of 2019, Jesus Javier contacted FLC Fidencio, who
promised work for Jesus Javier and his family that summer.

726.    On or around June 13, 2019, Jesus Javier signed a Worker Disclosure
and Information Statement, which was in English.

727.    Jesus Javier speaks and reads very little English.

728.    The Worker Disclosure and Information Statement stated he would be
earning $9.25 per hour.

729.    Jesus Javier drove to Illinois in his truck, along with his wife Yadira;
his son, J.J.Z.; his daughters, Jennifer and Maria Abigail; his nephew, Jose E.; two
other minor children (not parties); Jennifer's partner (not a party), Jennifer's three
children, the Hernandez Children; and Maria Abigail's two children, the Casarez
Children.

730.    When Jesus Javier arrived in Illinois, he signed a second Worker
Disclosure and Information Statement, which provided a rate of pay of $13 per
hour.

731.    While in Illinois that summer, Jesus Javier lived in a WoodSpring
motel room with Yadira; J.J.Z.; Jose E.; and his two other minor children.

732.    While in Illinois that summer, Jennifer stayed in a WoodSpring motel
room with her partner (not a party); her children, the Hernandez Children; her

sister, Maria Abigail; and Maria Abigail's children, the Casarez Children.

733.    During the day, while their families were at work, the Children generally went to a daycare center that Defendant PHI provided for the Workers.

734.    Before work each morning, a family member would bring the Children to the Candlewood to leave them with their babysitter. Sometimes they remained there, and sometimes they transferred to a daycare facility.

735.    On several occasions, Jesus Javier, Yadira, J.J.Z., Jose E., Jennifer, and Maria Abigail noticed that their checks were short some hours of pay.

736.    When they pointed out the shortfalls to FLC Fidencio, he generally paid them the missing wages in the next week's check or with an additional check.

737.    At the end of the summer, however, Maria Abigail's final check was missing two full days of work, for which she was never paid.

738.    Jose E.'s last two checks were also missing about four and three hours, respectively, for which he was never paid.

*The July Event*

739.    In the late afternoon of July 23, 2019, Jesus Javier, Yadira, J.J.Z., Jose E., Maria Abigail and Jennifer were working in a field for Defendant PHI.

740.    Yadira was about 4 weeks pregnant with Ja.Z. at that time.

741.    The Workers saw a helicopter pass overhead, spraying pesticides.

742.    They ran out of the field and waited at the side of the field.

743.    Jesus Javier, Yadira, J.J.Z., Jose E., Jennifer and Maria Abigail had fled to the side of the field opposite to where the buses were waiting.

81

744.    Jesus Javier went around the field on foot to get his truck from the other side.

745.    As the others waited for Jesus Javier to return in the truck, the children's babysitters contacted Maria and Jennifer to ask that the Casarez Children and the Hernandez Children be picked up as soon as possible.

746.    Therefore, after picking the rest of the family up, Jesus Javier went directly to the Candlewood and picked up the Children.

747.    The Hernandez Children were crowded with the family in the back seat of Jesus Javier's truck, with Jennifer and Maria Abigail.

748.    Jennifer had taken off her long-sleeved shirt, but otherwise had the same clothes on as when she was sprayed.

749.    No manager of Defendant PHI had warned the Workers not to touch other family members before showering and changing all clothing.

750.    For that reason, the Hernandez Children (the youngest of whom was only three months old) were exposed to the pesticide residue that remained on Jennifer's and other family members' skin, clothing, and protective gear.

751.    As the family got out of the truck to go inside the motel, Jennifer's son Ad.H. left one of his shoes behind.

752.    When Jennifer returned to retrieve it, she noticed that the shoe smelled like pesticides.

753.    After and as the result of the July Event, Jesus Javier, Yadira, Jennifer, and J.J.Z. all experienced physical and emotional symptoms.

754.    After and as the result of the July Event, the Hernandez Children also experienced symptoms.

755.    Three-month-old Al.H. had always had mild eczema, but the day after the July Event, it seemed to have worsened, and she was very irritable.

756.    Also within a day or two of the July Event, all of the Hernandez Children started experiencing diarrhea.

757.    Because the Hernandez Children's diarrhea continued, a few days later, Jennifer took them to a local clinic.

758.    The diarrhea lasted about a week.

759.    Jennifer had always been able to treat Al.H.'s eczema with over-the-counter cream, which had been effective at clearing up symptoms.

760.    However, after the July Event, the worsened eczema no longer responded to the over-the-counter cream.

761.    Jennifer stopped working after the July Event, due the Hernandez Children's illness.

762.    On July 31, 2019, Yadira sought treatment at Carle Hospital because she continued to experience a range of symptoms, and had also started experiencing vaginal bleeding and abdominal cramping, which made her fear she was miscarrying Ja.Z.

763.    Over a year after the July Event, Jennifer and Al.H. continue to experience effects of and symptoms related to the exposure.

*The August Event*

764.    In the afternoon of August 5, 2019, Jesus Javier was working in a field, with J.J.Z. and Jose E. also working nearby.

765.    Maria Abigail had entered the field with Jesus Javier, J.J.Z., and Jose E., but left the field to retrieve a forgotten item.

766.    Yadira also left the field to use one of the portable toilets.

767.    On her way back, while still a few feet outside the field, Maria Abigail could see that a plane was circling above the field and that it was spraying.

768.    Maria Abigail called Jesus Javier to tell him to get the family out of the field.

769.    Jesus Javier told Jose E. to get out quickly because a plane was spraying.

770.    J.J.Z. saw the plane and felt liquid spray hitting him.

771.    They all ran off the field.

772.    Jesus Javier, J.J.Z., and Jose E. left the field and saw other workers washing themselves off.

773.    Jesus Javier saw a PHI manager on the phone, and heard him say the Workers could go back into the field.

774.    Jesus Javier saw FLC Arminda challenge the PHI manager, asking him if he was sure the Workers could go back in.

775.    FLC Arminda then told the Workers to return to the field.

776.    Jesus Javier, J.J.Z., and Jose E. returned to the field, and a few

minutes later the plane returned again.

777.  Maria Abigail did not return to the field.

778.  From where she stood near the field, she saw the plane return and she called Jesus Javier again to tell him to get the family out.

779.  Again, they ran out.

780.  They did not wash themselves off, and no one told them to do so.

781.  Immediately after and as the result of the August Event, Jesus Javier felt symptoms of illness, including feeling his face going numb and that his throat was closing.

782.  After and as the result of the August Event, J.J.Z. also felt immediate symptoms, including dizziness and numbness of his lips.

783.  When Yadira stepped out of the portable toilet she could smell the ambient pesticides, and as a result, she experienced symptoms, including feeling ill and weak.

784.  After and as the result of the August Event, Maria Abigail also experienced symptoms, including sore throat, shortness of breath, and headache.

785.  Jesus Javier, J.J.Z., Yadira, Maria Abigail, and Jose E. all got into Jesus Javier's truck to head back to the motel.

786.  On the way, Jesus Javier picked up the Casarez Children from their daycare provider at the Candlewood.

787.  He dropped Yadira off at WoodSpring, because she did not feel well and needed to relieve Jennifer, who had been caring for their small children (her

own and Yadira's) all day.

788.    Around this time, Jose E. had started to experience worsening symptoms, including feeling ill and faint, with an extremely dry mouth and throat.

789.    Jesus Javier decided everyone should go to the hospital.

790.    No manager of Defendant PHI had warned the Children's family members not to touch them before changing all clothing and showering, or allow them near clothing that had been exposed to pesticides.

791.    For that reason, the Casarez Children were exposed to the chemicals that remained on Maria Abigail and other family members' skin, clothing, and protective gear.

792.    By the time the family arrived at Carle Hospital, Jose E. was feeling too weak to stand.

793.    Someone approached with a wheelchair and Jose E. collapsed into it.

794.    He had trouble remaining conscious while staff tried to register him.

795.    Hospital staff had all of the family members who were present wait outside in wheelchairs, as the hospital staff did not want them to come in before being decontaminated.

796.    After about half an hour, hospital staff showed them to a facility where they could shower.

797.    After the family took showers, the hospital staff provided them with scrubs to wear.

798.    A healthcare provider screened Jesus Javier, J.J.Z., Jose E., Maria

Abigail, and the Casarez Children, and then released them.

799.    A hospital staff member returned the family's clothing.

800.    The family received discharge papers stating their clothing was "contaminated" and instructing them to "wash it carefully."

801.    That same evening, at around 10:00 p.m., Jose E. tried to eat a bite of food and immediately started vomiting so severely that his aunt, Yadira, called for an ambulance.

802.    An ambulance took Jose E. to OSF.

803.    Maria Abigail was also experiencing symptoms, including a severe headache, and her throat was still sore and tight, so she also went to OSF.

804.    Hospital staff at OSF examined Jose E. and Maria Abigail, and took blood samples and x-rays.

805.    OSF staff gave Jose E. Zofran, a medication for nausea, and an IV patch, and then discharged him.

806.    OSF staff gave Maria Abigail acetaminophen and Phenergan, a medication for nausea.

807.    OSF staff told Jose E. and Maria Abigail to take a day off to rest before returning to work, which they did.

808.    However, Defendant PHI required them both to attend a meeting about the August Event the next day.

809.    Neither were paid for attending this meeting.

810.    On August 7, 2019, Jesus Javier drove Jose E. to a pharmacy to fill his

prescription. While in the truck, Jose E. felt like he could not catch his breath.

811.    In the pharmacy, Jose E. continued to be unable to catch his breath, so Jesus Javier called an ambulance.

812.    Jose E. returned to OSF where he was examined again and released.

813.    Jose E. did not work again after the August Event, because he continued to be too ill to do so.

814.    Jose E.'s mother came to Illinois to pick him up and bring him back to Texas before the season ended.

815.    After and as the result of the August Event, the rest of the family, Jesus Javier, Yadira, J.J.Z., Jennifer, and Maria Abigail continued to experience a range of physical and emotional effects of the exposure, but did not leave Illinois until the season ended.

816.    Jesus Javier continued to experience symptoms of illness resulting from the August Event in the days that followed, and at times felt too exhausted to complete his work.

817.    A few days after the August Event, Jesus Javier felt very ill after smelling something in his truck that smelled like the pesticides.

818.    Jesus Javier decided to return to Carle.

819.    When he told receiving staff that he had no insurance, they asked him to identify his employer, which he did.

820.    Shortly thereafter, Dylan Haun arrived at Carle with a translator. He told Jesus Javier that no pesticides had been sprayed, and that Defendant PHI would not cover the cost of the hospital visit.

821.    Fearing an unaffordable bill from the hospital, Jesus Javier decided to leave without being examined.

822.    About 10 days after the August Event, L.C. started showing the following symptoms: a cough; irritability; scaly patches on his scalp; and a white coating on his tongue.

823.    Maria Abigail took L.C. back to Carle on August 18, 2019, where he was diagnosed with candidal stamatitis (thrush) and seborrheic dermatitis.

824.    In the months following the August Event, Jesus Javier, Yadira, J.J.Z., Jose E., Maria Abigail, and L.C. continued to experience related physical and emotional symptoms, some of which still continue.

## CLAIMS FOR RELIEF

**Count 1:   Violations of the AWPA—Violations of the working arrangement
through violations of the WPS, claims
by all the Workers and the Children
against Defendant PHI**

825.    The Workers and the Children re-allege the above paragraphs as if fully set forth herein.

826.    Defendant PHI constitutes an "agricultural employer" within the meaning of the AWPA. *See* 29 U.S.C. § 1802(2).

827.    No agricultural employer "shall, without justification, violate the terms of any working arrangement made by that contractor, employer, or association with

any migrant agricultural worker." 29 U.S.C. § 1822(c).

828.    The working arrangement necessarily incorporates requirements imposed by federal, state, or local law upon the parties.

829.    The Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), administered by the USEPA, governs the use of pesticides in the United States. 7 U.S.C. §§ 136-136y.

830.    Under the FIFRA, the USEPA created protections for agricultural workers through pesticide-specific restrictions and label requirements, called the Worker Protection Standards ("WPS"). 40 C.F.R. Part 170.

831.    Defendant PHI constitutes an "agricultural employer" within the meaning of the WPS.

832.    The Workers' "working arrangement" incorporates the WPS.

833.    Under the WPS, the agricultural employer must assure that workers receive required protections. *Id.* §§ 170.7(a); 170.309(a), (b).

834.    The WPS requires agricultural employers to provide sufficient water for washing and emergency eye flushing, sufficient soap, and single-use towels. *Id.* §§170.150(b),(c); 170.411.

835.    On July 23, 2019, Defendant PHI failed to provide sufficient water for washing and emergency eye flushing, sufficient soap, and single-use towels, to Plaintiffs Hada, Lidianelly, David, Ramon, Alberto Jr., Liliana, E.R., Patricia, V.A., Vanessa, Luis, Miguel, Judith, S.V., Jesus Javier, Yadira, J.J.Z., Jose E., Maria Abigail, and Jennifer, after they were exposed to pesticides.

836.   The AWPA creates a private right of action for any person aggrieved by a violation. *Id.* § 1854(a).

837.   The above Workers are all persons aggrieved by Defendant PHI's violation of the AWPA.

838.   The Children were also aggrieved by this failure because it caused them to be exposed to pesticides through contact with their family members.

839.   On August 5, 2019, Defendant PHI failed to provide sufficient water for washing and emergency eye flushing, sufficient soap, and single-use towels, to Plaintiffs Hada, Lidianelly, David, Mario, Ramon, Alberto Jr., Consuelo, Adrian, A.P., Gilbert, Luis, Miguel, Ediel, Judith, S.V., Jesus Javier, J.J.Z., and Jose E.

840.   Alberto Sr., Yadira, Ja.Z., Maria Abigail and the Casarez Children were also aggrieved by this failure because it caused them to be exposed to pesticides through contact with their family members.

841.   The WPS forbids any agricultural employer from allowing or directing any person other than a trained and equipped handler to enter or remain in areas treated with pesticide. *Id.* § 170.110; *see also id.* § 170.407(a).

842.   On August 5, 2019, Defendant PHI directed Plaintiffs Hada, Lidianelly, David, Mario, Ramon, Alberto Jr., Consuelo, Adrian, A.P., Gilbert, Luis, Miguel, Ediel, Judith, S.V., Jesus Javier, Yadira, J.J.Z., Jose E., and Maria Abigail to return to the just-sprayed field.

843.   The Children were also aggrieved by this failure because it caused them to be exposed to pesticides through contact with their family members.

91

844. The WPS also forbids any agricultural employer, after the application of any pesticide on an agricultural establishment, from allowing or directing any worker to enter or remain in the treated area before the restricted-entry interval specified on the pesticide labeling has expired. *Id.* § 170.112(a); *see also id.* § 170.407(a).

845. Each of the chemicals involved in the August Event specified restricted entry intervals of 12 hours. Brigade label at 3; Trivapro label at 6; Avaris label at 6; Sultrus label at 4.

846. On August 5, 2019, Defendant PHI directed Plaintiffs Hada, Lidianelly, David, Mario, Ramon, Alberto Jr., Consuelo, Adrian, A.P., Gilbert, Luis, Miguel, Ediel, Judith, S.V., Jesus Javier, Yadira, J.J.Z., Jose E., and Maria Abigail to return to the just-sprayed field before 12 hours, the entry interval specified on the pesticide labeling, had expired.

847. The Children were also aggrieved by this action because it caused them to be exposed to pesticides through contact with their family members.

848. Where an agricultural employer directs a worker to perform activities in a treated area before expiration of the restricted-entry interval, the employer must ensure the worker is at least 18 years old, provide the worker certain information, ensure the worker's knowledge of the labels and use of proper protective equipment, ensure that that equipment is not taken home, and provide additional decontamination equipment and supplies. *See* 40 C.F.R. § 605.

849. On August 5, 2019, Defendant PHI directed Plaintiffs Hada,

Lidianelly, David, Mario, Ramon, Alberto Jr., Consuelo, Adrian, A.P., Gilbert, Luis, Miguel, Ediel, Judith, S.V., Jesus Javier, Yadira, J.J.Z., Jose E., and Maria Abigail to return to the just-sprayed field before 12 hours, the entry interval specified on the pesticide labeling, had expired, without complying with any of the duties listed in § 605, including failing to ensure that Adrian, A.P., S.V., J.J.Z., and Jose E. were at least 18 (they were not), failing to provide proper decontamination equipment and supplies, and failing to ensure protective equipment was not brought home.

850.   The Children were also aggrieved by this failure because it caused them to be exposed to pesticides through contact with their family members.

851.   The WPS requires agricultural employers who have "reason to believe" that any worker has been injured by exposure to pesticides, regardless of whether the exposure occurred as the result of "application, splash, spill, drift, or pesticide residues," to provide prompt transportation to an appropriate emergency medical facility. *Id.* § 170.160.

852.   On July 23, 2019, Defendant PHI had reason to believe that Plaintiffs Hada, Lidianelly, David, Ramon, Alberto Jr., Liliana, E.R., Patricia, V.A., Vanessa, Luis, Miguel, Judith, S.V., Jesus Javier, Yadira, J.J.Z., Jose E., Maria Abigail, and Jennifer had all been injured by exposure to pesticides, and failed to provide them prompt transportation to an appropriate emergency medical facility.

853.   The Children were also aggrieved by this failure because it caused them to be exposed to pesticides through contact with their family members.

854.   On August 5, 2019, Defendant PHI had reason to believe that

Plaintiffs Hada, Lidianelly, David, Mario, Ramon, Alberto Jr., Consuelo, Adrian,

A.P., Gilbert, Luis, Miguel, Ediel, Judith, S.V., Jesus Javier, Yadira, J.J.Z., Jose E.,

and Maria Abigail had all been injured by exposure to pesticides, and failed to

provide them prompt transportation to an appropriate emergency medical facility.

855.    Alberto Sr., Ja.Z., and the Casarez Children were also aggrieved by

this failure because it caused them to be exposed to pesticides through contact with

their family members.

856.    The WPS requires agricultural employers who have "reason to believe"

that any worker has been injured by exposure to pesticides, regardless of whether

the exposure occurred as the result of "application, splash, spill, drift, or pesticide

residues," to provide the exposed person or medical personnel "any obtainable

information" on the product name, registration number, and active ingredients of

the products to which the person was exposed, antidote and first aid information,

and circumstances of the application and exposure. *Id.*

857.    On July 23, 2019, Defendant PHI had reason to believe that Plaintiffs

Hada, Lidianelly, David, Ramon, Alberto Jr., Liliana, E.R., Patricia, V.A., Vanessa,

Luis, Miguel, Judith, S.V., Jesus Javier, Yadira, J.J.Z., Jose E., Maria Abigail, and

Jennifer had all been injured by exposure to pesticides, but failed to provide them

obtainable information, including the name, registration number, and active

ingredients of the products to which they were exposed, antidote and first aid

information, and circumstances of the application and exposure.

858.    On August 5, 2019, Defendant PHI had reason to believe that

Plaintiffs Hada, Lidianelly, David, Mario, Ramon, Alberto Jr., Consuelo, Adrian, A.P., Gilbert, Luis, Miguel, Ediel, Judith, S.V., Jesus Javier, Yadira, J.J.Z., Jose E., and Maria Abigail had all been injured by exposure to pesticides, but failed to provide them obtainable information, including the name, registration number, and active ingredients of the products to which they were exposed, antidote and first aid information, and circumstances of the application and exposure.

859.    The WPS requires agricultural employers to display information about any pesticide that has been applied within the last 30 days, including the product name, active ingredient, time and date of application, and how long entry is restricted. *Id.* § 170.122.

860.    On July 23, 2019, Defendant PHI failed to display any information about the pesticide or pesticides that had been applied.

861.    On August 5, 2019, Defendant PHI failed to display any information about the pesticide or pesticides that had been applied.

862.    The WPS requires agricultural employers to display safety information about any pesticide that has been applied within the last 30 days. *Id.* §§ 170.135; 170.309(h); 170.311.

863.    On July 23, 2019, Defendant PHI failed to display any safety information about the pesticide or pesticides that had been applied.

864.    On August 5, 2019, Defendant PHI failed to display any safety information about the pesticide or pesticides that had been applied.

865.    Each of the above failures constituted a separate violation of the

parties' working arrangements and warrants a separate award of damages.

866. Defendant violated these terms of the working arrangements without justification.

867. Defendant therefore violated the AWPA with respect to each of the above-named Workers and affected Children. 29 U.S.C. § 1802(2).

868. The Workers and Children have attempted to resolve all of these issues before resorting to litigation, but were unable to reach an accord.

**Count 2:   Violations of the AWPA—violations of the working arrangement through violations of the FSS, claims by all the Workers against Defendant PHI**

869. The Workers re-allege the above paragraphs as if fully set forth herein.

870. Defendant PHI constitutes an "agricultural employer" within the meaning of the AWPA. *See* 29 U.S.C. § 1802(2).

871. No agricultural employer "shall, without justification, violate the terms of any working arrangement made by that contractor, employer, or association with any migrant agricultural worker." 29 U.S.C. § 1822(c).

872. The working arrangement necessarily incorporates requirements imposed by federal, state, or local law upon the parties.

873. Under the Occupational Safety and Health Act ("OSHA"), the USDOL created field sanitation standards ("FSS") applicable to any agricultural establishment where 11 or more employees work in hand-labor field operations. *See* 29 C.F.R. § 1928.110(a).

874. Defendant PHI constitutes an "agricultural establishment" within the

96

meaning of the FSS.

875.   The Workers' "working arrangement" incorporates the FSS.

876.   *Inter alia*, the FSS require that

    a.    Toilet facilities be maintained in clean and sanitary condition;

    b.    Handwashing facilities be refilled with potable water as necessary to ensure an adequate supply; and

    c.    The employer inform employees of the importance of drinking water frequently.

29 C.F.R. § 1928.10(3),(4).

877.   Defendant PHI repeatedly violated these provisions in the following ways:

    a.    It failed to keep the toilets reasonably clean;

    b.    It failed to provide sufficient toilet paper and sufficient water for handwashing;

    c.    It failed to provide adequate drinking water, and instead of informing the employees about the importance of drinking frequently, discouraged them from drinking "too much" water.

878.   Defendant therefore violated the working arrangement, and therefore violated the AWPA, with respect to each of the Workers. 29 U.S.C. § 1802(2).

879.   The Workers have attempted to resolve all of these issues before resorting to litigation, but were unable to reach an accord.

**Count 3:   Violation of the AWPA—providing false information about terms
and conditions of employment, claims
by all the Workers
against Defendant PHI**

880.   The Workers re-allege the above paragraphs as if fully set forth herein.

881.   Defendant PHI constitutes an "agricultural employer" within the

meaning of the AWPA. *See* 29 U.S.C. § 1802(2).

882.   No agricultural employer shall "knowingly provide false or misleading

information to any migrant agricultural worker concerning . . . conditions . . . of

agricultural employment required to be disclosed by subsection (a), (b), (c), or (d)."

*Id.* § 1821(f).

883.   Two days after the August Event, on August 7, 2019, Defendant PHI

called the Workers together to discuss the August Event.

884.   At that time, Defendant PHI, through its agent Dylan Haun, made a

number of false claims about the August Event.

885.   Defendant PHI falsely claimed there was no chemical released over the

field where the Workers had been working.

886.   Defendant PHI falsely denied that the symptoms the Workers had

experienced or continued to experience were related to chemical exposure during

the August Event.

887.   Defendant PHI falsely claimed that after a thorough investigation, it

had found that no one was sprayed with pesticides.

888.   Defendant PHI falsely claimed that all of those who had sought

medical care were completely released to work with no restrictions and no

symptoms.

889.   Defendant PHI falsely claimed that if anyone sought medical attention, their symptoms were not related to the August Event, and that these non-work-related injuries would not be covered by workers' compensation.

890.   Each of these claims constituted distinct knowingly false and misleading information about the Workers' conditions of employment, in that three toxic chemicals were known to have been released; the Workers' symptoms were plainly related to that chemical exposure, as medical personnel expressly acknowledged; several Workers' return-to-work letters required one or more days off from work; and the symptoms were work-related.

891.   Defendant made these false communications to each of the Workers and intended that each of the Workers receive them, whether or not the Worker was present at the August Event or directly heard its August 7, 2019 statements.

892.   Defendant therefore violated the AWPA with respect to each of the Workers. 29 U.S.C. § 1802(2).

893.   The Workers have attempted to resolve all of these issues before resorting to litigation, but were unable to reach an accord.

**Count 4:   Violations of the AWPA—failures to make, keep, and preserve records, claims by all the Workers against Defendant PHI**

894.   The Workers re-allege the above paragraphs as if fully set forth herein.

895.   Defendant PHI constitutes an "agricultural employer" within the meaning of the AWPA. *See* 29 U.S.C. § 1802(2).

99

896.    Under the AWPA, every agricultural employer which employs any migrant agricultural worker shall, with respect to each such worker, make, keep, and preserve records for three years of the following information:

(A)    the basis on which wages are paid;

(B)    the number of piecework units earned, if paid on a piecework basis;

(C)    the number of hours worked;

(D)    the total pay period earnings;

(E)    the specific sums withheld and the purpose of each sum withheld; and

(F)    the net pay.

29 U.S.C. § 1821(d).

897.    In the months preceding this litigation, each of the Workers requested in writing that Defendant PHI provide the above records, pursuant to a requirement of state law.

898.    Defendant PHI failed to produce any records stating the number of hours the Workers worked, their total pay period earnings, the specific sums withheld or their net pay, and represented that it produced the records it had in its possession.

899.    On information and belief, Defendant PHI has not made, kept, or preserved such records.

900.    Defendant PHI therefore violated § 1821(d) with respect to each of the

Workers.

901.   The Workers have attempted to resolve all of these issues before resorting to litigation, but were unable to reach an accord.

**Count 5:   Violations of the AWPA—failures to disclose workers' compensation information required under 29 U.S.C. § 1821(a)(8), claims by all the Workers against Defendant PHI**

902.   The Workers re-allege the above paragraphs as if fully set forth herein.

903.   Defendant PHI constitutes an "agricultural employer" within the meaning of the AWPA. *See* 29 U.S.C. § 1802(2).

904.   Every agricultural employer that employs any migrant agricultural worker shall ascertain and disclose certain information "at the time of the worker's recruitment," including "whether State workers' compensation insurance is provided, and, if so, the name of the State workers' compensation insurance carrier, the name of the policyholder of such insurance, the name and the telephone number of each person who must be notified of an injury or death, and the time period within which such notice must be given." 29 U.S.C. § 1821(a)(8); *see also* 29 C.F.R. § 500.76(b).

905.   Defendant PHI failed to disclose in writing at the time of the Workers' recruitment (1) whether workers' compensation insurance was provided; (2) the name of the carrier; (3) the name of the policyholder; (4) the name and telephone number of each person who must be notified of an injury or death; and (5) the time within which that notice was required to be given.

906.   Defendant PHI therefore violated each of these five provisions of

101

§ 1821(a)(8) with respect to each of the Workers.

907.   The Workers have attempted to resolve all of these issues before resorting to litigation, but were unable to reach an accord.

**Count 6:   Violations of the AWPA—failures to provide information at the time of recruitment as required under 29 U.S.C. § 1821(a)(1)-(7), claims by Plaintiffs Ramon, Consuelo, Adrian, and A.P., against Defendant PHI**

908.   The above-named Workers re-allege the above paragraphs as if fully set forth herein.

909.   Defendant PHI constitutes an "agricultural employer" within the meaning of the AWPA. *See* 29 U.S.C. § 1802(2).

910.   Under the AWPA, every agricultural employer that recruits any migrant agricultural worker is required to "ascertain and *disclose in writing* to each such worker . . . the following information *at the time of the worker's recruitment*," including (1) the place of employment; (2) the wage rates to be paid; (3) the crops and kinds of activities on which the worker may be employed; (4) the period of employment; (5) the transportation, housing, and any other employee benefit to be provided, if any, and any costs to be charged for each of them; (6) the existence of any strike or other concerted work stoppage, slowdown, or interruption of operations by employees at the place of employment; and (7) the existence of any arrangements with any owner or agent of any establishment in the area of employment under which the farm labor contractor, the agricultural employer, or the agricultural association is to receive a commission or any other benefit resulting

102

from any sales by such establishment to the workers." *See* 29 U.S.C. § 1821(a) (emphasis added); *see also* 29 C.F.R. § 500.76(b).

911.   Defendant PHI recruited Ramon, Consuelo, Adrian, and A.P. in Texas or Indiana in the spring of 2019.

912.   Defendant PHI did not provide any of the written disclosures required under § 1821(a)(1)-(7) at the time of recruitment to Ramon, Consuelo, Adrian, and A.P.

913.   Defendant PHI therefore violated these seven provisions of § 1821(a) with respect to Ramon, Consuelo, Adrian and A.P.

914.   Ramon, Consuelo, Adrian and A.P. have attempted to resolve all of these issues before resorting to litigation, but were unable to reach an accord.

**Count 7:   Violations of the AWPA—failures to pay wages when due, claims by Plaintiffs Mario, Ramon, Alberto Sr., Alberto Jr., Consuelo, Adrian, A.P., Patricia, Gilbert, Luis, Miguel, Ediel, Judith, S.V., Jesus Javier, Yadira, J.J.Z., Jose E., Maria Abigail, and Jennifer against Defendant PHI**

915.   The above-named Workers re-allege the above paragraphs as if fully set forth herein.

916.   Defendant PHI constitutes an "agricultural employer" within the meaning of the AWPA. *See* 29 U.S.C. § 1802(2).

917.   Every agricultural employer that employs any migrant agricultural worker shall pay the wages owed to such worker when due. *Id.* § 1822(a).

918.   The Workers' wages were due the Friday following the week in which the work was performed.

919.   As set out in detail above, Defendant PHI failed to pay Mario, Ramon, Alberto Sr., Alberto Jr., Patricia, Gilbert, Luis, Miguel, Jose E., and Maria Abigail wages for work performed.

920.   Defendant PHI also failed to pay Alberto Sr., Alberto Jr., Consuelo, Adrian, A.P., Ediel, Judith, S.V., Jesus Javier, Yadira, J.J.Z., Jose E., Maria Abigail, and Jennifer all of the wages they were owed *when due*, paying them only later, after they had pointed out that hours were missing.

921.   In addition, for the first several weeks of work, Defendant PHI failed to pay Alberto Sr. for driving the workers back to their lodgings—his "clock" stopped when the other Workers got off the field each day.

922.   Only after Alberto Sr. and others complained did Defendant PHI start to pay him for this time.

923.   Defendant PHI therefore violated this provision of § 1822(a) with respect to Mario, Ramon, Alberto Sr., Alberto Jr., Consuelo, Adrian, A.P., Patricia, Gilbert, Luis, Miguel, Ediel, Judith, S.V., Jesus Javier, Yadira, J.J.Z., Jose E., Maria Abigail, and Jennifer.

924.   Mario, Ramon, Alberto Sr., Alberto Jr., Consuelo, Adrian, A.P., Patricia, Gilbert, Luis, Miguel, Ediel, Judith, S.V., Jesus Javier, Yadira, J.J.Z., Jose E., Maria Abigail, and Jennifer have attempted to resolve all of these issues before resorting to litigation, but were unable to reach an accord.

**Count 8:   Violations of the AWPA—violations of language requirements, claims by Plaintiffs Hada, David, Liliana, E.R., Patricia, V.A., Vanessa, and Jesus Javier against Defendant PHI**

925.    The above-named Workers re-allege the above paragraphs as if fully set forth herein.

926.    Defendant PHI constitutes an "agricultural employer" within the meaning of the AWPA. *See* 29 U.S.C. § 1802(2).

927.    The disclosures required by § 1821(a) through (c) "shall be provided in written form. Such information shall be provided in English or, as necessary and reasonable, in Spanish or other language common to migrant agricultural workers who are not fluent or literate in English." *Id.* § 1821(g).

928.    Hada, Liliana, and Jesus Javier speak and read Spanish and do not speak or read sufficient English to conduct business in English.

929.    Hada's Worker Disclosure and Information Statement was in English.

930.    Hada signed employment-related documents on behalf of her son David, who was a minor at the time, and his Worker Disclosure and Information Statement was in English.

931.    Liliana's Worker Disclosure and Information Statement was in English.

932.    Liliana signed employment-related documents on behalf of minors E.R., Patricia, V.A., and Vanessa, and their Worker Disclosure and Information Statements were in English.

933.    Jesus Javier's Worker Disclosure and Information Statement was in

105

English.

934.   Defendant PHI provided Hada, Liliana, and Jesus Javier with a Worker Disclosure and Information Statement for themselves and the minors in their care, but failed to provide that information in Spanish.

935.   Given that Hada, Liliana, and Jesus Javier do not read English and do read Spanish, it was necessary and reasonable to provide the information in Spanish.

936.   Defendant PHI therefore violated § 1821(g) with respect to Hada, Liliana, and Jesus Javier, and for the minors on whose behalf they received the Worker Disclosure and Information Statements, David and E.R., Patricia, V.A., and Vanessa; respectively.

937.   Hada, David, Liliana, E.R., Patricia, V.A., Vanessa, and Jesus Javier have attempted to resolve all of these issues before resorting to litigation, but were unable to reach an accord.

**Count 9:   Violations of the AWPA—providing false information about terms
and conditions of employment, claims
by Plaintiffs Hada and David
against Defendant PHI**

938.   Plaintiffs Hada and David re-allege the above paragraphs as if fully set forth herein.

939.   Defendant PHI constitutes an "agricultural employer" within the meaning of the AWPA. *See* 29 U.S.C. § 1802(2).

940.   No agricultural employer shall "knowingly provide false or misleading information to any migrant agricultural worker concerning the terms, conditions, or

existence of agricultural employment required to be disclosed by subsection (a), (b), (c), or (d)." *Id.* § 1821(f).

941.    At the time of recruitment, the Salinases, as agents of Defendant PHI, falsely told Hada that housing would be provided free of charge.

942.    Hada also received this false information on behalf of her son David, who was a minor at the time.

943.    Both Hada and David were aggrieved by this violation.

944.    When Hada and her family arrived in Illinois they learned that their housing stipend, $22 per day, per Worker, would not cover the cost of their lodging, and they were required to cover the balance.

945.    Defendant PHI therefore violated § 1821(f) with respect to Hada and David.

946.    Hada and David have attempted to resolve all of these issues before resorting to litigation, but were unable to reach an accord.

**Count 10:  Violations of the AWPA—providing false information about terms
and conditions of employment, claims
by Plaintiffs Alberto Sr. and Ediel
against Defendant PHI**

947.    Plaintiffs Alberto Sr. and Ediel re-allege the above paragraphs as if fully set forth herein.

948.    Defendant PHI constitutes an "agricultural employer" within the meaning of the AWPA. *See* 29 U.S.C. § 1802(2).

949.    No agricultural employer shall "knowingly provide false or misleading information to any migrant agricultural worker concerning the terms, conditions, or

existence of agricultural employment required to be disclosed by subsection (a), (b), (c), or (d)." *Id.* § 1821(f).

950.    Alberto Sr.'s Worker Disclosure and Information Statement falsely stated that he would be engaged in roguing and detasseling, when in fact he was engaged in driving a bus.

951.    It also falsely stated that he would be paid only for one-way travel to work sites, when in fact he was entitled to be paid for two-way travel as a bus driver.

952.    Ediel's Worker Disclosure and Information Statement, falsely stated that he would be engaged in roguing and detasseling, when, for the first several weeks, he was also transporting portable toilets.

953.    It also falsely stated that he would be paid only for one-way travel to work sites, when in fact he was entitled to be paid for two-way travel when returning the portable toilets.

954.    Defendant PHI therefore violated § 1821(f) with respect to Alberto Sr. and Ediel.

955.    Alberto Sr. and Ediel have attempted to resolve all of these issues before resorting to litigation, but were unable to reach an accord.

**Count 11:  Violations of the AWPA— failures to provide information at the time of recruitment as required under 29 U.S.C. § 1821(a)(3), claims by Plaintiffs Alberto Sr. and Ediel against Defendant PHI**

956.    Plaintiffs Alberto Sr. and Ediel re-allege the above paragraphs as if fully set forth herein.

957.    Defendant PHI constitutes an "agricultural employer" within the meaning of the AWPA. *See* 29 U.S.C. § 1802(2).

958.    Under the AWPA, every agricultural employer that recruits any migrant agricultural worker is required to "ascertain and *disclose in writing* to each such worker . . . the following information at the time of the worker's recruitment," including (3) the crops and kinds of activities on which the worker may be employed. 29 U.S.C. § 1821(a)(3).

959.    Alberto Sr.'s Worker Disclosure and Information Statement, failed to disclose that he would be engaged in driving a bus.

960.    Ediel's Worker Disclosure and Information Statement, failed to disclose that he would be engaged in transporting portable toilets.

961.    Defendant PHI therefore violated § 1821(a)(3) with respect to Alberto Sr. and Ediel.

962.    Alberto Sr. and Ediel have attempted to resolve this issue before resorting to litigation, but were unable to reach an accord.

**Count 12:  Violations of the AWPA—violations of the working arrangement claims by Plaintiff Gilbert against Defendant PHI**

963.    The above-named Worker re-alleges the above paragraphs as if fully

set forth herein.

964.   Defendant PHI constitutes an "agricultural employer" within the meaning of the AWPA. *See* 29 U.S.C. § 1802(2).

965.   No agricultural employer "shall, without justification, violate the terms of any working arrangement made by that contractor, employer, or association with any migrant agricultural worker." 29 U.S.C. § 1822(c).

966.   Defendant PHI promised Gilbert, as part of the working arrangement, a stipend of $120 upon arrival.

967.   Defendant PHI failed to provide Gilbert with that stipend.

968.   Defendant PHI therefore violated § 1822(c) with respect to Gilbert.

969.   Gilbert has attempted to resolve all of these issues before resorting to litigation, but was unable to reach an accord.

### Count 13:  Violations of the FLSA—failures to pay wages owed for all hours worked, claims by all the Workers against Defendant PHI

970.   The Workers re-allege the above paragraphs as if fully set forth herein.

971.   Defendant PHI promised each of the Workers a 30-minute lunch, which was not paid.

972.   The FLSA requires employers to pay a wage for all of the work they do. *See* 29 U.S.C. § 2206.

973.   Pursuant to the FLSA, the DOL has enacted governing regulations. *See* 29 C.F.R. Part 785.

974.    Under governing regulations, a bona fide meal period must be a rest

period, during which the employee "must be completely relieved from duty for the purposes of eating regular meals . . . . The employee is not relieved if he is required to perform any duties, whether active or inactive, while eating." 29 C.F.R. § 785.19(a).

975.    On at least a weekly basis, the Workers were required to travel from field to field during their meal period, which did not constitute relief from duty.

976.    This constituted a failure to pay a wage for work performed and violated the FLSA.

### Count 14:  Violations of the FLSA—failures to pay wages owed for all hours worked, claims by Plaintiffs Mario, Ramon, Alberto Sr., Alberto Jr., Patricia, Gilbert, Luis, Miguel, Jose E., and Maria Abigail against Defendant PHI

977.    The above-named Workers re-allege the above paragraphs as if fully set forth herein.

978.    Defendant PHI constitutes an "employer" within the meaning of the FLSA. *See* 29 U.S.C. § 203(d).

979.    The FLSA requires every employer to pay the wages owed to such worker when due.

980.    As set out in detail above, Defendant PHI paid Mario, Ramon, Alberto Sr., Alberto Jr., Patricia, Gilbert, Luis, Miguel, Jose E., and Maria Abigail for fewer hours than they had worked.

981.    Defendant PHI failed to pay Alberto Sr. for approximately one-half hour of work performed each morning conducting a safety check of his bus.

982.    Defendant PHI failed to pay Jose E. and Maria Abigail for a mandatory meeting on August 6, 2019, the day after the August Event, which lasted about half an hour.

983.    Defendant PHI therefore violated this provision of the FLSA with respect to Mario, Ramon, Alberto Sr., Alberto Jr., Patricia, Gilbert, Luis, Miguel, Jose E. and Maria Abigail.

**Count 15:  Pendent state law claims—**
**Negligence (and willful and wanton conduct) during July Event, claims by**
**Plaintiffs Hada, Lidianelly, David, Ramon, Alberto Sr., Alberto Jr., Liliana,**
**E.R., Patricia, V.A., Vanessa, Luis, Miguel, Judith, S.V., Jesus Javier,**
**Yadira, J.J.Z., Jose E., Jennifer, the Hernandez Children, and Maria**
**Abigail**
**against Unknown Pesticide Applicator #1**

984.    The above-named Workers and above-named Children re-allege the above paragraphs as if fully set forth herein.

985.    On July 23, 2019, Defendant Unknown Pesticide Applicator #1 sprayed dangerous pesticides over the field in which Workers were working.

986.    Each of the Workers who was on or near the field on July 23, 2019, including Hada, Lidianelly, David, Ramon, Alberto Jr., Liliana, E.R., Patricia, V.A., Vanessa, Luis, Miguel, Judith, S.V., Jesus Javier, Yadira, J.J.Z., Jose E., Jennifer, and Maria Abigail wore appropriate visibility safety gear, including but not limited to neon orange hats, making them plainly visible. The bus containing Alberto Sr. was also plainly visible.

987.    Defendant Unknown Pesticide Applicator #1, and any agents of Defendant Unknown Pesticide Applicator #1, had a duty to ensure that it conducted

its pesticide application activities without endangering any person nearby, including but not limited to by taking reasonable steps to determine whether people were working nearby and to refrain from spraying if so.

988.   Defendant Unknown Pesticide Applicator #1 failed to take reasonable steps to ensure that it conducted its pesticide application activities without endangering the Workers and exposing them and their families to toxic pesticides.

989.   Defendant Unknown Pesticide Applicator #1 therefore breached its duty to the Workers and their families.

990.   Defendant Unknown Pesticide Applicator #1's action caused Hada, Lidianelly, David, Ramon, Alberto Sr., Alberto Jr., Liliana, E.R., Patricia, V.A., Vanessa, Luis, Miguel, Judith, S.V., Jesus Javier, Yadira, J.J.Z., Jose E., Jennifer, and Maria Abigail to be exposed to the dangerous pesticides.

991.   Defendant Unknown Pesticide Applicator #1's action also foreseeably caused the Hernandez Children to be exposed through the transfer of pesticides from their mother and other family members to them.

992.   Defendant Unknown Pesticide Applicator #1 failed to take reasonable precautions to avoid the danger it posed to these Workers and Children, even after it knew of that danger.

993.   Defendant Unknown Pesticide Applicator #1's activity, crop dusting, is generally associated with the risk of serious injury.

994.   Defendant Unknown Pesticide Applicator #1 performed that activity with reckless disregard for the safety of the Workers and their Children.

995.   The exposure caused these Workers and Children to experience illness and injury, including skin and eye inflammation, headaches, shortness of breath, nausea, diarrhea, dizziness, loss of appetite, excessive fatigue, confusion, and rashes, as well as increased risk of other medical conditions.

996.   The exposure and the resulting symptoms caused each of these Workers to be unable to work for some periods of time and limited their capacity to earn money.

997.   This exposure and the resulting symptoms required medical treatment, which caused these Workers and Children aggravation and inconvenience, as well as out-of-pocket costs in the form of co-insurance payments, travel costs to medical providers, and missed pay.

998.   This exposure and the resulting symptoms will continue to require medical treatment, causing anticipated and future continuing aggravation and inconvenience, as well as out-of-pocket costs in the form of co-insurance payments, travel costs to medical providers, and missed pay.

999.   This exposure and the resulting symptoms have caused and continue to cause these Workers to feel fear, anxiety, anger, sadness and humiliation.

1000.  This exposure and the resulting symptoms have caused these Children emotional distress.

**Count 16:  Pendent state law claims—**
**Negligence (and willful and wanton conduct),**
**during August Event, claims**
**by Plaintiffs Hada, Lidianelly, David, Mario, Ramon, Alberto Sr., Alberto**
**Jr., Consuelo, Adrian, A.P., Gilbert, Luis, Miguel, Ediel, Judith, S.V., Jesus**
**Javier, Yadira, J.J.Z., Jose E., Maria Abigail, and L.C.**
**against the Curless Defendants**

1001.  The above-named Workers and L.C. re-allege the above paragraphs as if fully set forth herein.

1002.  On August 5, 2019, the Curless Defendants sprayed dangerous pesticides over the field in which Workers were working.

1003.  Each of the Workers who was on or near the field on August 5, 2019, Hada, Lidianelly, David, Mario, Ramon, Alberto Jr., Consuelo, Adrian, A.P., Gilbert, Luis, Miguel, Ediel, Judith, S.V., Jesus Javier, Yadira, J.J.Z., Jose E., and Maria Abigail wore appropriate visibility safety gear, including but not limited to neon orange hats, making them plainly visible. The bus containing Alberto Sr. was also plainly visible.

1004.  The Curless Defendants had a duty to ensure that they and their agents conducted their pesticide application activities without endangering any person nearby, including but not limited to by taking reasonable steps to determine whether people were working within the range of their spray and drift and to refrain from spraying if so.

1005.  The Curless Defendants failed to take reasonable steps to ensure that they conducted their pesticide application activities without endangering the Workers and exposing them to toxic pesticides.

1006.  The Curless Defendants' action caused Plaintiffs Hada, Lidianelly, David, Mario, Ramon, Alberto Sr., Alberto Jr., Consuelo, Adrian, A.P., Gilbert, Luis, Miguel, Ediel, Judith, S.V., Jesus Javier, Yadira, J.J.Z., Jose E., and Maria Abigail to be directly exposed to the pesticides.

1007.  The Curless Defendants' action also foreseeably caused L.C. to be exposed through the transfer of pesticides from his mother and other family members to him.

1008.  The Curless Defendants failed to take reasonable precautions to avoid the danger they posed to these Workers and L.C., even after they knew of that danger.

1009.  The Curless Defendants' activity, crop dusting, is generally associated with the risk of serious injury.

1010.  The Curless Defendants' performed this activity with reckless disregard for the safety of the Workers and their families.

1011.  The exposure caused these Workers and L.C. to experience illness and injury, including but not limited to skin and eye inflammation, headaches, shortness of breath, nausea, diarrhea, dizziness, loss of appetite, excessive fatigue, confusion, and rashes, as well as increased risk of other medical conditions.

1012.  The exposure and the resulting symptoms caused these Workers to be unable to work for some periods of time and limited their capacity to earn money.

1013.  This exposure and the resulting symptoms required medical treatment, which caused these Workers and L.C. aggravation and inconvenience, as

well as out-of-pocket costs in the form of co-insurance payments, travel costs to medical providers, and missed pay.

1014.  This exposure and the resulting symptoms caused these Workers to feel fear, anxiety, anger, sadness and humiliation.

1015.  This exposure and the resulting symptoms have caused and continue to cause L.C. emotional distress.

**Count 17:  Pendent state law claims—Strict liability
(abnormally dangerous activity) for July Event, claims
by Plaintiffs Hada, Lidianelly, David, Ramon, Alberto Sr., Alberto Jr.,
Liliana, E.R., Patricia, V.A., Vanessa, Luis, Miguel, Judith, S.V., Jesus
Javier, Yadira, J.J.Z., Jose E., Jennifer, the Hernandez Children, and
Maria Abigail
against Unknown Pesticide Applicator #1**

1016.  The above-named Workers and above-named Children re-allege the above paragraphs as if fully set forth herein.

1017.  On July 23, 2019, Defendant Unknown Pesticide Applicator #1 sprayed dangerous pesticides over the field in which Workers were working.

1018.  Aerial application of pesticides carries a high degree of risk of harm to people.

1019.  The likelihood of harm to the Workers and Children in this case from such application was great.

1020.  Aerial application of pesticides is unusual and not commonplace.

1021.  Defendant Unknown Pesticide Applicator #1's aerial application of pesticides was inappropriate to the place where it was carried out, in that the Workers were present and working at or near enough to the location sprayed to be

exposed to dangerous chemicals.

1022.  The value of the application did not outweigh the danger it posed to the Workers and Children.

1023.  While, as stated in Count 15, Defendant Unknown Pesticide Applicator #1 could have, through the exercise of reasonable care, avoided exposing the Workers and Children to dangerous pesticides; in the alternative, and to the extent such exercise of reasonable care would not eliminate the risk, pesticide application is an abnormally dangerous activity warranting application of strict liability.

1024.  The exposure caused these Workers and Children to experience illness and injury, including skin and eye inflammation, headaches, shortness of breath, nausea, diarrhea, dizziness, loss of appetite, excessive fatigue, confusion, and rashes, as well as increased risk of other medical conditions.

1025.  The exposure and the resulting symptoms caused each of these Workers to be unable to work for some periods of time and limited their capacity to earn money.

1026.  This exposure and the resulting symptoms required medical treatment, which caused these Workers and Children aggravation and inconvenience, as well as out-of-pocket costs in the form of co-insurance payments, travel costs to medical providers, and missed pay.

1027.  This exposure and the resulting symptoms will continue to require medical treatment, causing anticipated and future continuing aggravation and inconvenience, as well as out-of-pocket costs in the form of co-insurance payments,

travel costs to medical providers, and missed pay.

1028.  This exposure and the resulting symptoms have caused and continue to cause these Workers to feel fear, anxiety, anger, sadness and humiliation.

1029.  This exposure and the resulting symptoms have caused these Children emotional distress.

**Count 18:  Pendent state law claims—**
**Strict liability (abnormally dangerous activity)**
**for August Event, claims**
**by Plaintiffs Hada, Lidianelly, David, Mario, Ramon, Alberto Sr., Alberto Jr., Consuelo, Adrian, A.P., Gilbert, Luis, Miguel, Ediel, Judith, S.V., Jesus Javier, Yadira, J.J.Z., Jose E., Maria Abigail, and L.C.**
**against the Curless Defendants**

1030.  The above-named Workers and L.C. re-allege the above paragraphs as if fully set forth herein.

1031.  On July 23, 2019, the Curless Defendants sprayed dangerous pesticides over the field in which Workers were working.

1032.  Aerial application of pesticides carries a high degree of risk of harm to people.

1033.  The likelihood of harm to the Workers and L.C. in this case from such application was great.

1034.  Aerial application of pesticides is unusual and not commonplace.

1035.  The Curless Defendants' aerial application of pesticides was inappropriate to the place where it was carried out, in that the Workers were present and working at or near enough to the location sprayed to be exposed to dangerous chemicals.

1036.  The value of the application did not outweigh the danger it posed to the Workers and L.C.

1037.  While, as stated in Count 16, the Curless Defendants could have, through the exercise of reasonable care, avoided exposing the Workers and Children to dangerous pesticides; in the alternative, and to the extent such exercise of reasonable care would not eliminate the risk, pesticide application is an abnormally dangerous activity warranting application of strict liability.

1038.  The exposure caused these Workers and L.C. to experience illness and injury, including but not limited to skin and eye inflammation, headaches, shortness of breath, nausea, diarrhea, dizziness, loss of appetite, excessive fatigue, confusion, and rashes, as well as increased risk of other medical conditions.

1039.  The exposure and the resulting symptoms caused these Workers to be unable to work for some periods of time and limited their capacity to earn money.

1040.  This exposure and the resulting symptoms required medical treatment, which caused these Workers and L.C. aggravation and inconvenience, as well as out-of-pocket costs in the form of co-insurance payments, travel costs to medical providers, and missed pay.

1041.  This exposure and the resulting symptoms caused these Workers to feel fear, anxiety, anger, sadness and humiliation.

1042.  This exposure and the resulting symptoms have caused and continue to cause L.C. emotional distress.

### Count 19:  Pendent state law claims—
### Negligence (and willful and wanton conduct),
### during July Event, claims
### by the Hernandez Children
### against Defendant PHI

1043.  The Hernandez Children re-allege the above paragraphs as if fully set forth herein.

1044.  On July 23, 2019, Defendant PHI permitted the Workers to work in a field over which dangerous pesticides were sprayed while they were working.

1045.  Defendant PHI knew or reasonably should have known that many of the Workers had small children who would be exposed to the pesticides when the Workers returned to their lodgings after work that day.

1046.  Defendant PHI had a duty to ensure that the Workers were able to perform their work without causing exposures to their children, including but not limited to by taking reasonable steps to determine whether and when fields would be sprayed.

1047.  Defendant PHI failed to ensure that the Workers were able to perform their work without experiencing such exposures, breaching its duty.

1048.  Defendant PHI's breach of duty caused Jennifer, Maria Abigail, and other family members of the Hernandez Children to be directly exposed to the pesticides, and caused the Hernandez Children to be exposed by transfer from their family members to them.

1049.  Defendant PHI failed to take reasonable precautions to avoid the danger posed to these Children, even after it knew of that danger.

1050.  Defendant PHI's activity, farming in an areas in which crop dusting is known to occur, is generally associated with the risk of serious injury.

1051.  Defendant PHI acted with reckless disregard for the safety of these Children throughout its response to the July Event.

1052.  The exposure caused the Hernandez Children to experience illness and injury, including skin inflammation, nausea, diarrhea, loss of appetite, and rashes.

1053.  The exposure and the resulting symptoms required medical treatment, which caused the Hernandez Children aggravation and inconvenience, as well as out-of-pocket costs in the form of co-insurance payments, travel costs to medical providers, and missed family income.

1054.  This exposure and the resulting symptoms caused the Hernandez Children emotional distress.

### Count 20:  Pendent state law claim— Negligence (and willful and wanton conduct) during August Event, claim by Plaintiff L.C. against Defendant PHI

1055.  L.C. re-alleges the above paragraphs as if fully set forth herein.

1056.  On August 5, 2019, Defendant PHI permitted the Workers to work in a field over which dangerous pesticides were sprayed while they were working.

1057.  Defendant PHI knew or reasonably should have known that many of the Workers had small children who would be exposed to the pesticides when they returned to their lodgings after work that day.

1058.  Defendant PHI had a duty to ensure that the Workers were able to perform their work without causing exposures to their children, including but not

122

limited to by taking reasonable steps to determine whether and when fields would be sprayed.

1059.  Defendant PHI failed to ensure that the Workers were able to perform their work without such exposures, breaching its duty.

1060.  Defendant PHI's breach of duty caused Maria Abigail and other family members of L.C. to be directly exposed to the pesticides, and caused L.C. to be exposed by transfer from his family members to him.

1061.  Defendant PHI failed to take reasonable precautions to avoid the danger posed to L.C., even after it knew of that danger.

1062.  Defendant PHI's activity, farming in an areas in which crop dusting is known to occur, is generally associated with the risk of serious injury.

1063.  Defendant PHI acted with reckless disregard for the safety of L.C. throughout its response to the August Event.

1064.  The exposure caused L.C. to experience symptoms including coughing, irritability, and seborrheic dermatitis.

1065.  This exposure and the resulting symptoms will cause L.C. to continue to require medical treatment, causing anticipated and future continuing aggravation and inconvenience, as well as out-of-pocket costs in the form of co-insurance payments, travel costs to medical providers, and missed pay.

1066.  This exposure and the resulting symptoms caused L.C. emotional distress.

**Count 21:  Pendent state law claims—**
**Battery during July Event, claims**
**by Plaintiffs Hada, Lidianelly, David, Ramon, Alberto Jr., Liliana, E.R.,**
**Patricia, V.A., Vanessa, Luis, Miguel, Judith, S.V., Jesus Javier, Yadira,**
**Ja.Z., J.J.Z., Jose E., Jennifer, and Maria Abigail**
**against Unknown Pesticide Applicator #1**

1067.  The above-named Workers and Ja.Z. re-allege the above paragraphs as if fully set forth herein.

1068.  On July 23, 2019, Defendant Unknown Pesticide Applicator #1 sprayed dangerous pesticides over the field in which Workers were working.

1069.  Any agents of the Defendant Unknown Pesticide Application #1 acted at all times within the scope of their employment.

1070.  Each of the Workers who was on or near the field on July 23, 2019, Plaintiffs Hada, Lidianelly, David, Ramon, Alberto Jr., Liliana, E.R., Patricia, V.A., Vanessa, Luis, Miguel, Judith, S.V., Jesus Javier, Yadira, J.J.Z., Jose E., Jennifer, and Maria Abigail wore appropriate visibility safety gear, including but not limited to neon orange hats, making them plainly visible.

1071.  The bus containing Alberto Sr. was also plainly visible.

1072.  Defendant Unknown Pesticide Applicator #1, and any agents of Defendant Unknown Pesticide Applicator #1, knew that by spraying pesticides in such proximity to the Workers, it was substantially certain that the pesticide and its residue would make contact with those Workers and with Ja.Z.

1073.  By spraying pesticides in such proximity to the Workers, Defendant Unknown Pesticide Applicator #1, and any agents of Defendant Unknown Pesticide Applicator #1, did cause pesticide and pesticide residue to make contact with those

Workers and with Ja.Z.

1074.  Defendant Unknown Pesticide Applicator #1 intended to cause pesticide and pesticide residue to make contact with those Workers and with Ja.Z.

1075.  These Workers and Ja.Z. did not in any manner consent to Defendant Unknown Pesticide Application #1 causing pesticide and pesticide residue to make contact with them.

1076.  Defendant Unknown Pesticide Applicator #1's action caused Plaintiffs Hada, Lidianelly, David, Ramon, Alberto Jr., Liliana, E.R., Patricia, V.A., Vanessa, Luis, Miguel, Judith, S.V., Jesus Javier, Yadira, Ja.Z., J.J.Z., Jose E., Jennifer, and Maria Abigail to be exposed to the pesticides.

1077.  As set out above with respect to each individual, the exposure caused these Workers to experience illness and injury, including skin and eye inflammation, headaches, shortness of breath, nausea, diarrhea, dizziness, loss of appetite, excessive fatigue, confusion, and rashes, as well as increased risk of other medical conditions.

1078.  The exposure and the resulting symptoms caused each of these Workers to be unable to work for some periods of time and limited their capacity to earn money.

1079.  This exposure and the resulting symptoms required medical treatment, which caused these Workers aggravation and inconvenience, as well as out-of-pocket costs in the form of co-insurance payments, travel costs to medical providers, and missed pay.

125

1080.  This exposure and the resulting symptoms caused each of these Workers to feel fear, anxiety, anger, sadness and humiliation.

1081.  The Workers were lawfully present on or near the field not due to their personal choice but because it was necessary for them to fulfill their duties to their employer.

1082.  The Workers did not have the means or ability to simply leave the area of the field on their own, but were dependent upon the means provided by the employer.

1083.   Several of the Workers were minors, such as David (17 years old), Alberto Jr. (17 years old), E.R. (15 years old), Patricia (16 years old), V.A. (15 years old), Vanessa (17 years old), S.V. (15 years old), J.J.Z. (16 years old), and Jose E. (17 years old), and or had other vulnerabilities, such as being pregnant (Yadira), in utero (Ja.Z.), or over 60 (Luis and Miguel).

1084.  Defendant Unknown Pesticide Applicator #1 knew or reasonably should have known that at least some of the Workers would be minors as young as 15 or have other special vulnerabilities.

1085.  Defendant Unknown Pesticide Applicator #1 nevertheless committed its intentional battery with willful and callous disregard of, and reckless indifference to, these vulnerabilities of the Workers, including minors, a pregnant woman, and her fetus.

1086.  The egregiousness of Defendant Unknown Pesticide Applicator #1's intentional battery warrants punitive damages.

126

**Count 22:  Pendent state law claims—**
**Assault during July Event, claims**
**by Plaintiffs Hada, Lidianelly, David, Ramon, Alberto Jr., Liliana, E.R.,**
**Patricia, V.A., Vanessa, Luis, Miguel, Judith, S.V., Jesus Javier, Yadira,**
**Jose E., Jennifer, and Maria Abigail**
**against Unknown Pesticide Applicator #1**

1087.  The above-named Workers re-allege the above paragraphs as if fully set forth herein.

1088.  On July 23, 2019, Defendant Unknown Pesticide Applicator #1 sprayed dangerous pesticides over the field in which Workers were working.

1089.  Any agents of the Defendant Unknown Pesticide Application #1 acted at all times within the scope of their employment.

1090.  Each of the Workers who was on or near the field on July 23, 2019, Plaintiffs Hada, Lidianelly, David, Ramon, Alberto Jr., Liliana, E.R., Patricia, V.A., Vanessa, Luis, Miguel, Judith, S.V., Jesus Javier, Yadira, J.J.Z., Jose E., Maria Abigail, and Jennifer wore appropriate visibility safety gear, including but not limited to neon orange hats, making them plainly visible.

1091.  The bus containing Alberto Sr. was also plainly visible.

1092.  Defendant Unknown Pesticide Applicator #1, and any agents of Defendant Unknown Pesticide Applicator #1, knew that spraying pesticides in such proximity to the Workers made it likely that the pesticide and its residue would make injurious contact with those Workers if not prevented.

1093.  By spraying pesticides in such proximity to the Workers, Defendant Unknown Pesticide Applicator #1, and any agents of Defendant Unknown Pesticide Applicator #1, knew that their actions made it substantially certain that they would

127

create a well-founded fear of imminent peril in the Workers.

1094.  Defendant Unknown Pesticide Applicator #1 intentionally and unlawfully caused the Workers a well-founded fear of imminent peril from the pesticide spray.

1095.  Defendant Unknown Applicator #1's actions caused Plaintiffs Hada, Lidianelly, David, Ramon, Alberto Jr., Liliana, E.R., Patricia, V.A., Vanessa, Luis, Miguel, Judith, S.V., Jesus Javier, Yadira, Jose E., Maria Abigail, and Jennifer a well-founded fear that they would imminently be sprayed with pesticides.

1096.  Defendant Unknown Applicator #1's assault caused each of these Workers also to feel anxiety, anger, sadness and humiliation.

1097.  The Workers were lawfully present on or near the field not due to their personal choice but because it was necessary for them to fulfill their duties to their employer.

1098.  The Workers did not have the means or ability to simply leave the area of the field on their own, but were dependent upon the means provided by the employer.

1099.   Several of the Workers were minors, such as David (17 years old), Alberto Jr. (17 years old), E.R. (15 years old), Patricia (16 years old), V.A. (15 years old), Vanessa (17 years old), S.V. (15 years old), and Jose E. (17 years old), and or had other vulnerabilities, such as being pregnant (Yadira), or over 60 (Luis and Miguel).

1100.  Defendant Unknown Pesticide Applicator #1 knew or reasonably

should have known that at least some of the Workers would be minors or have other special vulnerabilities.

1101.  Defendant Unknown Pesticide Applicator #1 nevertheless committed its intentional assault with willful and callous disregard of, and reckless indifference to, these vulnerabilities of the Workers, including minors and a pregnant woman.

1102.  The egregiousness of Defendant Unknown Pesticide Applicator #1's assault warrants punitive damages.

**Count 23:  Pendent state law claims—**
**Battery during August Event, claims**
**by Plaintiffs Hada, Lidianelly, David, Mario, Ramon, Alberto Sr., Alberto**
**Jr., Consuelo, Adrian, A.P., Gilbert, Luis, Miguel, Ediel, Judith, S.V., Jesus**
**Javier, Yadira, Ja.Z., J.J.Z., Jose E., and Maria Abigail**
**against the Curless Defendants**

1103.  The above-named Workers re-allege the above paragraphs as if fully set forth herein.

1104.  On August 5, 2019, the Curless Defendants sprayed dangerous pesticides over the field in which Workers were working.

1105.  Any agents of the Curless Defendants acted at all times within the scope of their employment.

1106.  Each of the Workers who was on or near the field on August 5, 2019, Plaintiffs Hada, Lidianelly, David, Mario, Ramon, Alberto Jr., Consuelo, Adrian, A.P., Gilbert, Luis, Miguel, Ediel, Judith, S.V., Jesus Javier, Yadira, J.J.Z., Jose E., and Maria Abigail wore appropriate visibility safety gear, including but not limited to neon orange hats, making them plainly visible.

1107. The bus containing Alberto Sr. was also plainly visible.

1108. The Curless Defendants, and any of their agents, knew that by spraying pesticides in such proximity to the Workers, it was substantially certain that the pesticide and its residue would make contact with those Workers.

1109. By spraying pesticides in such proximity to the Workers, the Curless Defendants, and any of their agents, did cause pesticides and pesticide residue to make contact with those Workers and with Ja.Z.

1110. The Curless Defendants intended to cause pesticides and pesticide residue to make contact with those Workers and with Ja.Z.

1111. These Workers and Ja.Z. did not in any manner consent to the Curless Defendants causing pesticide and pesticide residue to make contact with them.

1112. The Curless Defendants' actions caused Plaintiffs Hada, Lidianelly, David, Mario, Ramon, Alberto Sr., Alberto Jr., Consuelo, Adrian, A.P., Gilbert, Luis, Miguel, Ediel, Judith, S.V., Jesus Javier, Yadira, Ja.Z., J.J.Z., Jose E., and Maria Abigail to be exposed to the pesticides.

1113. As set out in detail above with respect to each individual, the exposure caused these Workers to experience illness and injury, including skin and eye inflammation, headaches, shortness of breath, nausea, diarrhea, dizziness, loss of appetite, excessive fatigue, confusion, and rashes, as well as increased risk of other medical conditions.

1114. The exposure and the resulting symptoms caused each of these Workers to be unable to work for some periods of time and limited their capacity to

earn money.

1115.  This exposure and the resulting symptoms required medical treatment, which caused these Workers aggravation and inconvenience, as well as out-of-pocket costs in the form of co-insurance payments, travel costs to medical providers, and missed pay.

1116.  This exposure and the resulting symptoms caused each of these Workers to feel fear, anxiety, anger, sadness and humiliation.

1117.  The Workers were lawfully present on or near the field not due to their personal choice, but because it was necessary for them to fulfill their duties to their employer.

1118.  The Workers did not have the means or ability to simply leave the area of the field on their own, but were dependent upon the means provided by the employer.

1119.   Several of these Workers were minors, such as David (17 years old), Alberto Jr. (17 years old), Adrian (17 years old), A.P. (15 years old), S.V. (15 years old), J.J.Z. (16 years old), and Jose E. (17 years old), or had other vulnerabilities, such as being pregnant (Yadira), in utero (Ja.Z.), or over 60 (Luis and Miguel).

1120.  The Curless Defendants knew or reasonably should have known that at least some of the Workers would be minors or have other vulnerabilities.

1121.  The Curless Defendants nevertheless committed their intentional battery with willful and callous disregard of, and reckless indifference to, these vulnerabilities of the Workers, including minors, a pregnant woman, and her fetus.

1122.  The egregiousness of the Curless Defendants' intentional battery warrants punitive damages.

### Count 24:  Pendent state law claims --<br>Assault during August Event, claims<br>by Plaintiffs Hada, Lidianelly, David, Mario, Ramon, Alberto Sr., Alberto Jr., Consuelo, Adrian, A.P., Gilbert, Luis, Miguel, Ediel, Judith, S.V., Jesus Javier, Yadira, J.J.Z., Jose E., and Maria Abigail<br>against the Curless Defendants

1123.  The above-named Workers re-allege the above paragraphs as if fully set forth herein.

1124.  On August 5, 2019, the Curless Defendants sprayed dangerous pesticides over the field in which Workers were working.

1125.  Any agents of the Curless Defendants acted at all times within the scope of their employment.

1126.   Each of the Workers who was on or near the field on August 5, 2019, Plaintiffs Hada, Lidianelly, David, Mario, Ramon, Alberto Jr., Consuelo, Adrian, A.P., Gilbert, Luis, Miguel, Ediel, Judith, S.V., Jesus Javier, Yadira, J.J.Z., Jose E., and Maria Abigail wore appropriate visibility safety gear, including but not limited to neon orange hats, making them plainly visible.

1127.  The bus containing Alberto Sr. was also plainly visible.

1128.  The Curless Defendants and their agents knew that spraying pesticides in such proximity to the Workers made it likely that the pesticide and its residue would make injurious contact with those Workers if not prevented.

1129.  By spraying pesticides in such proximity to the Workers, the Curless Defendants and their agents knew that their actions made it substantially certain

that they would create a well-founded fear of imminent peril in the Workers.

1130.  The Curless Defendants intentionally and unlawfully caused the Workers a well-founded fear of imminent peril from the pesticide spray.

1131.  The Curless Defendants' actions caused Plaintiffs Hada, Lidianelly, David, Mario, Ramon, Alberto Sr., Alberto Jr., Consuelo, Adrian, A.P., Gilbert, Luis, Miguel, Ediel, Judith, S.V., Jesus Javier, Yadira, J.J.Z., Jose E., and Maria Abigail a well-founded fear that they would imminently be sprayed with pesticides.

1132. The Curless Defendants' assault caused each of these Workers also to feel anxiety, anger, sadness and humiliation.

1133.  The Workers were lawfully present on or near the field not due to their personal choice but because it was necessary for them to fulfill their duties to their employer.

1134.  The Workers did not have the means or ability to simply leave the area of the field on their own, but were dependent upon the means provided by the employer.

1135.   Several of the Workers were minors, such as David (17 years old), Alberto Jr. (17 years old), Adrian (17 years old), A.P. (15 years old), S.V. (15 years old), J.J.Z. (16 years old), and Jose E. (17 years old), or had other vulnerabilities, such as being pregnant (Yadira), or over 60 (Luis and Miguel).

1136.  The Curless Defendants knew or reasonably should have known that at least some of the Workers would be minors or have other special vulnerabilities.

1137.  The Curless Defendants nevertheless committed their intentional

133

assault with willful and callous disregard of, and reckless indifference to, these vulnerabilities of the Workers, including minors and a pregnant woman.

1138.  The egregiousness of the Curless Defendants' intentional assault warrants punitive damages.

### Count 25:  Pendent state law claim
### Battery during August Event, claims
### by Plaintiffs Hada, Lidianelly, David, Mario, Ramon, Consuelo, Adrian, A.P., Luis, Miguel, Ediel, Judith, S.V., Jesus Javier, Jose E., and J.J.Z. against Defendant PHI

1139.  The above-named Workers re-allege the above paragraphs as if fully set forth herein.

1140.  On August 5, 2019, Defendant PHI directed and caused Plaintiffs Hada, Lidianelly, David, Mario, Ramon, Consuelo, Adrian, A.P., Luis, Miguel, Ediel, Judith, S.V., Jesus Javier, Jose E., and J.J.Z. to enter a field that had just been sprayed with pesticides.

1141.  The field contained highly toxic, harmful compounds that remained ambient in the field at the time these Defendants ordered the Workers to enter it.

1142.  The Workers went back into the field and were exposed to these toxic and harmful compounds as the result of Defendant PHI's order.

1143.  Defendant PHI knew for certain that the field had just been sprayed with pesticides and knew for certain that those pesticides would remain ambient on it.

1144.  Defendant PHI knew that the Workers would obey their orders to enter the just-sprayed field because they would feel it their duty and because they

would fear losing their jobs or their pay if they disobeyed.

1145.  Defendant PHI nevertheless ordered the Workers to go into the field, knowing in each case that the Worker would be exposed to hazardous pesticides by doing so.

1146.  Defendant PHI therefore specifically intended to batter the above-named Workers by ordering them to return to work in the field.

1147.  As set out above with respect to each individual, the exposure caused these Workers to experience illness and injury, including skin and eye inflammation, headaches, shortness of breath, nausea, diarrhea, dizziness, loss of appetite, excessive fatigue, confusion, and rashes, as well as increased risk of other medical conditions.

1148.  The exposure and the resulting symptoms caused these Workers to be unable to work for some periods of time and limited their capacity to earn money.

1149.  This exposure and the resulting symptoms required medical treatment and consultation, which caused these Workers aggravation and inconvenience, as well as out-of-pocket costs in the form of co-insurance payments, travel costs to medical providers, and missed pay.

1150.  This exposure and the resulting symptoms caused these Workers to feel fear, anxiety, anger, sadness and humiliation.

1151. Defendant PHI knew that several of these Workers were minors, including David (17 years old), Adrian (17 years old), A.P. (15 years old), S.V. (15 years old), Jose E. (17 years old), and J.J.Z. (16 years old)) or persons over 60 (Luis

and Miguel).

1152.  The egregiousness of Defendant PHI's intentional battery warrants punitive damages.

### Count 26:  Pendent state law claims— Illinois Wage Payment and Collection Act ("IWPCA"), claims by all the Workers against Defendant PHI

1153.  The Workers re-allege the above paragraphs as if fully set forth herein.

1154.  Defendant PHI promised that each of the Workers would have a daily, unpaid, 30-minute lunch break.

1155.  Defendant PHI promised each of the Workers that they would be compensated for one-way travel to their work sites.

1156.  The IWPCA requires employers to pay employees all wages earned for all of the work they do. 820 Ill. Comp. Stat. Ann. § 115/4.

1157.  On at least a weekly basis, the Workers were required to travel from field to field during their meal period, time during which they should have been paid because it was "work," in that it was part of their job duties, and because they were promised pay for that work.

1158.  Defendant PHI repeatedly failed to pay the Workers for these 30-minute periods, even though they were working.

1159.  The IWPCA provides that Workers may file suit to claim unpaid wages, and that such workers are also entitled to a penalty of 2% of the underpayment for each month during which the underpayment remained unpaid, and attorneys' fees. *Id.* § 115/14.

**Count 27:  Pendant state law claims—**
**Violation of the IWPCA—failures to pay wages owed**
**for all hours worked, claims**
**by Plaintiffs Mario, Ramon, Alberto Sr., Alberto Jr., Patricia, Gilbert, Luis,**
**Miguel, Jose E. and Maria Abigail**
**against Defendant PHI**

1160.  The above-named Workers re-allege the above paragraphs as if fully set forth herein.

1161.  Defendant PHI promised Alberto Jr., Gilbert, Luis, Miguel, Jose E. and Maria Abigail that they would be compensated at the rate of $9.25 for each hour of work.

1162.  Defendant PHI promised Mario and Ramon that they would be compensated at the rate of $10 for each hour of work.

1163.  Defendant PHI promised Alberto Sr. that he would be compensated at the rate of $15 for each hour of work.

1164.  The IWPCA requires employers to pay employees all wages earned for all of the work they do. 820 Ill. Comp. Stat. Ann. § 115/4.

1165.  As set out in detail above, Defendant PHI failed to pay Mario, Ramon, Alberto Sr., Alberto Jr., Patricia, Gilbert, Luis, Miguel, Maria Abigail, and Jose E. for all of the hours that they had worked.

1166.  Defendant PHI also failed to pay Alberto Sr. for approximately one-half hour of work performed each morning conducting a safety check of his bus.

1167.  Defendant PHI failed to pay Jose E. and Maria Abigail for a mandatory meeting on August 6, 2019, the day after the August Event, which lasted about half an hour.

1168.  Defendant PHI therefore violated the IWPCA with respect to Mario, Ramon, Alberto Sr., Alberto Jr., Patricia, Gilbert, Luis, Miguel, Jose E., and Maria Abigail.

1169.  The IWPCA provides that Workers may file suit to claim unpaid wages, and that such workers are also entitled to a penalty of 2% of the underpayment for each month during which the underpayment remained unpaid, and attorney's fees. *Id.* § 115/14.

### Count 28:  Pendent state law claims— Breaches of contract, Violations of the WPS, claims by the Workers against Defendant PHI

1170.  The Workers re-allege the above paragraphs as if fully set forth herein.

1171.  The Workers' agreements to perform detasseling work for Defendant PHI under the terms and conditions expressed in their Worker Disclosure and Information Statements constituted valid and enforceable contracts.

1172.  The Workers performed their obligations under those contracts.

1173.   The Workers' contracts contained implicit terms requiring Defendant PHI to comply with federal, state, and local law.

1174.  The FIFRA, administered by the USEPA, governs the use of pesticides in the United States. 7 U.S.C. §§ 136-136y.

1175.  Under the FIFRA, the USEPA created protections for agricultural workers through pesticide-specific restrictions and label requirements, called the Worker Protection Standards ("WPS"). 40 C.F.R. Part 170.

138

1176.  Defendant PHI constitutes an "agricultural employer" within the meaning of the WPS.

1177.  The Workers' contracts incorporated the WPS.

1178.  Under the WPS, the agricultural employer must assure that workers receive required protections. *Id.* § 170.7(a)(1), 170.309(a), (b).

1179.  The WPS requires agricultural employers to provide sufficient water for washing and emergency eye flushing, sufficient soap, and single-use towels. *Id.* §§ 170.150(b),(c); 170.411.

1180.  On July 23, 2019, Defendant PHI failed to provide sufficient water for washing and emergency eye flushing, sufficient soap, and single-use towels, to Plaintiffs Hada, Lidianelly, David, Ramon, Alberto Jr., Liliana, E.R., Patricia, V.A., Vanessa, Luis, Miguel, Judith, S.V., Jesus Javier, Yadira, J.J.Z., Jose E., Maria Abigail, and Jennifer, after they were exposed to pesticides.

1181.  On August 5, 2019, Defendant PHI failed to provide sufficient water for washing and emergency eye flushing, sufficient soap, and single-use towels, to Plaintiffs Hada, Lidianelly, David, Mario, Ramon, Alberto Jr., Consuelo, Adrian, A.P., Gilbert, Luis, Miguel, Ediel, Judith, S.V., Jesus Javier, J.J.Z., and Jose E.

1182.  The WPS forbids any agricultural employer from allowing or directing any person other than a trained and equipped handler to enter or remain in areas treated with pesticide. *Id.* § 170.110; *see also id.* § 170.407(a).

1183.  On August 5, 2019, Defendant PHI directed Hada, Lidianelly, David, Mario, Ramon, Alberto Jr., Consuelo, Adrian, A.P., Gilbert, Luis, Miguel, Ediel,

Judith, S.V., Jesus Javier, J.J.Z., Jose E., and Maria Abigail to return to a field just sprayed with pesticides.

1184.  The WPS also forbids any agricultural employer, after the application of any pesticide on an agricultural establishment, from allowing or directing any worker to enter or remain in the treated area before the restricted-entry interval specified on the pesticide labeling has expired. *Id.* § 170.112(a); *see also id.* § 170.407(a).

1185.  Each of the chemicals involved in the August Event specified restricted entry intervals of 12 hours. Brigade label at 3; Trivapro label at 6; Avaris label at 6; Sultrus label at 4.

1186.  On August 5, 2019, Defendant PHI directed Plaintiffs Hada, Lidianelly, David, Mario, Ramon, Alberto Jr., Consuelo, Adrian, A.P., Gilbert, Luis, Miguel, Ediel, Judith, S.V., Jesus Javier, Yadira, J.J.Z., Jose E., and Maria Abigail to return to the just-sprayed field before 12 hours, the entry interval specified on the pesticide labeling, had expired.

1187.  Where an agricultural employer directs a worker to perform activities in a treated area before expiration of the restricted-entry interval, the employer must ensure the worker is at least 18 years old, provide the worker certain information, ensure the worker's knowledge of the labels and use of proper protective equipment, ensure that that equipment is not taken home, and provide additional decontamination equipment and supplies. *See* 40 C.F.R. § 605.

1188.  On August 5, 2019, Defendant PHI directed Plaintiffs Hada,

Lidianelly, David, Mario, Ramon, Alberto Jr., Consuelo, Adrian, A.P., Gilbert, Luis, Miguel, Ediel, Judith, S.V., Jesus Javier, Yadira, J.J.Z., Jose E., and Maria Abigail to return to the just-sprayed field before 12 hours, the entry interval specified on the pesticide labeling, had expired, without complying with any of the duties listed in § 605, including failing to ensure that Adrian, A.P., S.V., J.J.Z., and Jose E. were at least 18 (they were not), failing to provide proper decontamination equipment and supplies, and failing to ensure protective equipment was not brought home.

1189.  The WPS requires agricultural employers who have "reason to believe" that any worker has been injured by exposure to pesticides, regardless of whether the exposure occurred as the result of "application, splash, spill, drift, or pesticide residues," to provide prompt transportation to an appropriate emergency medical facility. *Id.* § 170.160.

1190.  On July 23, 2019, Defendant PHI had reason to believe that Plaintiffs Hada, Lidianelly, David, Ramon, Alberto Jr., Liliana, E.R., Patricia, V.A., Vanessa, Luis, Miguel, Judith, S.V., Jesus Javier, Yadira, J.J.Z., Jose E., Maria Abigail, and Jennifer had all been injured by exposure to pesticides, and failed to provide them prompt transportation to an appropriate emergency medical facility.

1191.  On August 5, 2019, Defendant PHI had reason to believe Plaintiffs Hada, Lidianelly, David, Mario, Ramon, Alberto Jr., Consuelo, Adrian, A.P., Gilbert, Luis, Miguel, Ediel, Judith, S.V., Jesus Javier, Yadira, J.J.Z., Jose E, and Maria Abigail had all been injured by exposure to pesticides, and failed to provide them prompt transportation to an appropriate emergency medical facility.

1192.  The WPS requires agricultural employers who have "reason to believe" that any worker has been injured by exposure to pesticides, regardless of whether the exposure occurred as the result of "application, splash, spill, drift, or pesticide residues," to provide the exposed person or medical personnel "any obtainable information" on the product name, registration number, and active ingredients of the products to which the person was exposed, antidote and first aid information, and circumstances of the application and exposure. *Id.*

1193.  On July 23, 2019, Defendant PHI had reason to believe that Plaintiffs Hada, Lidianelly, David, Ramon, Alberto Jr., Liliana, E.R., Patricia, V.A., Vanessa, Luis, Miguel, Judith, S.V., Jesus Javier, Yadira, J.J.Z., Jose E., Maria Abigail, and Jennifer had all been injured by exposure to pesticides, but failed to provide them obtainable information, including the name, registration number, and active ingredients of the products to which they were exposed, antidote and first aid information, and circumstances of the application and exposure.

1194.  On August 5, 2019, Defendant PHI had reason to believe that Plaintiffs Hada, Lidianelly, David, Mario, Ramon, Alberto Jr., Consuelo, Adrian, A.P., Gilbert, Luis, Miguel, Ediel, Judith, S.V., Jesus Javier, Yadira, J.J.Z., Jose E., and Maria Abigail had all been injured by exposure to pesticides, but failed to provide them obtainable information, including the name, registration number, and active ingredients of the products to which they were exposed, antidote and first aid information, and circumstances of the application and exposure.

1195.  The WPS requires agricultural employers to display information about

142

any pesticide that has been applied within the last 30 days, including the product name, active ingredient, time and date of application, and how long entry is restricted. *Id.* § 170.122.

1196.  On July 23, 2019, Defendant PHI failed to display any information about the pesticide or pesticides that had been applied.

1197.  On August 5, 2019, Defendant PHI failed to display any information about the pesticide or pesticides that had been applied.

1198.  The WPS requires agricultural employers to display safety information about any pesticide that has been applied within the last 30 days. *Id.* § 170.135.

1199.  On July 23, 2019, Defendant PHI failed to display any safety information about the pesticide or pesticides that had been applied.

1200.  On August 5, 2019, Defendant PHI failed to display any safety information about the pesticide or pesticides that had been applied.

1201.  Each of the above failures constitutes a separate breach of the Workers' contracts.

1202.  These failures resulted in damages to each of the above Workers.

1203.  Because the contracts were formed in Texas, Texas law governs them.

1204.  Texas Civil Practice and Remedies Code § 38.001(8) provides for recovery of attorneys' fees for a claim of breach of contract.

1205.  The Workers seek recovery of reasonable attorney's fees pursuant to Texas Civil Practice and Remedies Code § 38.001(8).

### Count 29:  Pendent state law claims --
### Breaches of contract,
### Violations of the FSS, claims
### by the Workers
### against Defendant PHI

1206.  The Workers re-allege the above paragraphs as if fully set forth herein.

1207.  The Workers' agreements to perform detasseling work for Defendant PHI under the terms and conditions expressed in their Worker Disclosure and Information Statements constituted valid and enforceable contracts.

1208.  The Workers performed their obligations under those contracts.

1209.  The Workers' contracts contained implicit terms requiring Defendant PHI to comply with federal, state, and local law.

1210.  Under OSHA, the USDOL created the FSS, applicable to any agricultural establishment where 11 or more employees work in hand-labor field operations. *See* 29 C.F.R. § 1928.110(a).

1211.  Defendant PHI constitutes an "agricultural establishment" within the meaning of the FSS. *Id.*, § 1928.110(b)(iii).

1212.  The Workers' contracts incorporated the FSS.

1213. *Inter alia*, the FSS requires that

    a.    Toilet facilities be maintained in clean and sanitary condition;

    b.    Handwashing facilities be refilled with potable water as necessary to ensure an adequate supply; and

    c.    The employer inform employees of the importance of drinking water frequently.

144

29 C.F.R. § 1928.10(3),(4).

1214.  Defendant PHI repeatedly violated these provisions in the following ways:

  a. It failed to keep the toilets reasonably clean;

  b. It failed to provide sufficient toilet paper and sufficient water for handwashing;

  c. It failed to provide adequate drinking water, and instead of informing the employees about the importance of drinking frequently, discouraged them from drinking "too much" water.

1215.  Each of the above failures constitutes a separate breach of the Workers' contracts.

1216.  These failures resulted in damages to each of the above Workers.

1217.  Because the contracts were formed in Texas, Texas law governs them.

1218.  Texas Civil Practice and Remedies Code § 38.001(8) provides for recovery of attorneys' fees for a claim of breach of contract.

**Count 30:  Pendent state law claims --
Breaches of contract,
Failures to provide a paid lunch as agreed, claims
by all of the Workers
against Defendant PHI**

1219.  The Workers re-allege the above paragraphs as if fully set forth herein.

1220.  The Workers' agreements to perform work for Defendant PHI under the terms and conditions expressed in their Worker Disclosure and Information Statements constituted valid and enforceable contracts.

1221.  The Workers performed their obligations under those contracts.

1222.  Defendant PHI promised that each of the Workers would have a daily, unpaid, 30-minute lunch break.

1223.  Defendant PHI promised each of the Workers that they would be compensated for travel to their work sites.

1224.  On at least a weekly basis, the Workers were required to travel from field to field during their meal period, time during which they should have been paid because it was "work," in that it was part of their job duties, and because they were promised pay for that work.

1225.  Defendant PHI repeatedly failed to pay the Workers for these 30-minute periods.

1226.  Defendant PHI repeatedly failed to provide a lunch break as required by their contracts, instead requiring the Workers to perform unpaid work during that time.

1227.  Each of these failures constituted a breach of the Workers' contracts.

1228.  Each of these failures resulted in damages to the Workers.

1229.  Because the contracts were formed in Texas, Texas law governs them.

1230.  Texas Civil Practice and Remedies Code § 38.001(8) provides for recovery of attorneys' fees for a claim of breach of contract.

**Count 31:  Pendent state law claim --**
**Breaches of contract**
**Failures to pay agreed-upon wage for all hours worked, claims**
**by Plaintiffs Mario, Ramon, Alberto Sr., Alberto Jr., Patricia, Gilbert, Luis,**
**Miguel, Jose E. and Maria Abigail**
**against Defendant PHI**

1231.  The above-named Workers re-allege the above paragraphs as if fully set forth herein.

1232.  Alberto Jr., Patricia, Gilbert, Luis, Miguel, Jose E. and Maria Abigail's agreements to perform detasseling work for Defendant PHI under the terms and conditions expressed in their Worker Disclosure and Information Statements, including pay at $9.25 for each hour of work, constituted valid and enforceable contracts.

1233.  Mario and Ramon also had valid and enforceable contracts to perform detasseling work for Defendant PHI at the rate of $10 per hour.

1234.  Alberto Sr. also had a valid and enforceable contract to drive a bus for Defendant PHI at the rate of $15 per hour.

1235.  Defendant PHI failed to pay Mario, Ramon, Alberto Sr., Alberto Jr., Patricia, Gilbert, Luis, Miguel, Jose E. and Maria Abigail the promised pay for all of the hours that they had worked.

1236.  Each of these failures constituted a breach of these Workers' contracts.

1237.  Each of these failures resulted in damages to these Workers.

1238.  Because the contracts were formed in Texas, Texas law governs them.

1239.  Texas Civil Practice and Remedies Code § 38.001(8) provides for recovery of attorneys' fees for a claim of breach of contract.

147

## RELIEF REQUESTED

**WHEREFORE,** the Workers and the Children pray that this Court

A.     Award them all actual and statutory damages available under the AWPA;

B.     Award them all actual and statutory damages available under the FLSA;

C.     Award them all actual and statutory damages available under pendent state law claims;

D.     Award them compensatory damages for all of their intentional and negligence-based tort claims;

E.     Award them punitive damages for all of the tort claims allowing for such damages;

F.     Award them their reasonable costs and attorneys' fees;

G.     Grant such other relief as this Court deems equitable just and proper.

**DEMAND FOR A JURY TRIAL**

Plaintiffs demand a jury trial on all issues properly triable to a jury.

Dated:  December 2, 2020

Respectfully submitted,

s/        Miriam Hallbauer

Miriam Hallbauer, (312) 229-6360, is designated lead counsel per L.R. 11.2.

| | |
|---|---|
| Miriam Hallbauer<br>Lisa Palumbo<br>Mariyam Hussain<br>Lauren Dana<br>Legal Aid Chicago<br>120 S. La Salle, Ste. 900<br>Chicago, IL 60603<br>(312) 229-6360<br>mhallbauer@legalaidchicago.org<br>lpalumbo@legalaidchicago.org<br>mhussain@legalaidchicago.org<br>ldana@legalaidchicago.org | Daniela Dwyer<br>Texas Bar No. 24040842<br>Admitted to the C.D.Illinois<br>TEXAS RIOGRANDE LEGAL AID<br>Managing Attorney<br>Farmworker Team<br>301 S. Texas Ave.<br>Mercedes, TX 78596<br>(956) 447-4800<br>ddwyer@trla.org<br><br>Grace Kube<br>Wisconsin Bar No.: 1104723<br>Attorney for Plaintiffs<br>Admitted to the C.D. Illinois<br>TEXAS RIOGRANDE LEGAL AID<br>1206 E Van Buren St.<br>Brownsville, TX 78520<br>(956) 982-5540<br>gkube@trla.org |
| Eugene Schoon<br>Senior Counsel<br>Reiter Burns LLP<br>311 S. Wacker Drive<br>Chicago, Illinois  60606<br>(312) 982-0090 Office<br>(312) 586-1015 Direct<br>gschoon@reiterburns.com | Howard A. Learner<br>Ann Jaworski<br>Environmental Law & Policy Center<br>36 E. Wacker Dr. Suite 1600<br>Chicago, IL  60601<br>(312) 673-6500<br>(312) 795-3711<br>HLearner@elpc.org<br>AJaworski@elpc.org |